[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 329 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 330 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 331 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 332 
The order appealed from is assailed upon many grounds, and the magnitude of the public and private interests involved in this matter requires that each ground should be carefully examined and considered.
In 1866, an act was passed "supplementary to the act *Page 335 
entitled "An act to authorize the formation of railroad corporations, and to regulate the same, passed April 2, 1850." It provided that any number of persons, not less than ten, could "form themselves into a company for constructing, maintaining and operating a railway for public use, in the conveyance of persons and property by means of a propelling rope or cable attached to stationary power;" and that such company should have and enjoy all the powers and privileges, and be subject to the liabilities mentioned and comprised in the first twenty-six sections and section twenty-eight of the General Railroad Act of 1850.
Under that act, and the General Railroad Act, as I infer, "The West Side and Yonkers Patent Railway Company" was organized, and thereafter, in 1867, an act (chap. 489) was passed "to provide for the construction of an experimental line of railway, in the counties of New York and Westchester." It provided that the railway company just named could construct an elevated railway along Greenwich street and Ninth avenue, in the city of New York, to Harlem river, to be operated exclusively by means of propelling cables attached to stationary engines placed beneath or beyond the surface of the street. A short, experimental section was first to be constructed within one year, and then upon the approval of the three commissioners provided for in the act, the line could be extended to Harlem river within five years thereafter.
It was declared that the use of such railway in the streets through which it was authorized to extend its line, was a public use, and consistent with the uses for which the mayor, aldermen and commonalty held the same; and the company was authorized to take, hold and acquire real estate "under provisions of existing laws authorizing the formation of railroad companies and the acquisition of rights of way therefor."
In 1868 the Legislature passed an act entitled "An act supplementary to chapter 489 of the laws of 1867, and to provide for the collection and application of revenue in the *Page 336 
county of New York in certain cases." It extended the time for the construction of the experimental section, six months, and made it lawful for experiments to be made in different forms of application of the propelling cable or other motor upon the railway, and for the constructing company to adopt such form or motor as the commissioners should, after due experiment, recommend or approve; and it contained other provisions, all germane to the principal act.
The most important provisions in the act were those authorizing the company, which was by the prior acts confined to the use of stationary engines for motive power, to use any mode of propulsion which should be recommended or approved by the commissioners.
Objection is made that this is a local act; that its subject is not expressed in its title, and that therefore it is unconstitutional as in violation of sec. 16 of art. 3 of the State Constitution. This objection appears to be well founded. (People v. Hills, 35 N.Y., 449; People v. Briggs,50 N Y, 553, 561.) But it is not important now to determine whether it is or not, as any defect in that act was obviated or cured by the act, chap. 595 of the Laws of 1875, passed June 17 of that year, entitled "An act to authorize and require the New York Elevated Railroad Company to continue and complete its railroad in the city of New York, and to regulate the construction, operation and management thereof."
It does not appear how much or what "The West Side and Yonkers Patent Railway Company" had done toward the construction of its road prior to June, 1875. It is inferable from what appears in the act of 1875, that it had done something; and the New York Elevated Railroad Company had prior to that time been organized under the General Railroad Act. Section one of the act of 1875 recites the organization of the Elevated Railway Company under the the General Railroad Act, and the purchase by it under mortgage foreelosure and sale, and other transfer of all the rights, powers, privileges and franchises which were conferred upon the West Side and Yonkers Patent Railway Company *Page 337 
by the acts of 1867 and 1868, above referred to, and confirms it in the possession and enjoyment of said rights, powers, privileges and franchises as fully, and at large as they were granted in and by the acts aforesaid to the other company. Section two authorizes the Elevated Railroad Company to construct and complete at least one track of its road along and over the streets and places specified and permitted in the aforementioned acts, in the mode, manner and form prescribed by said acts, except as otherwise provided. Section three continues the commissioners provided for in the act of 1867; and section four provides that the company may make and adopt such alterations and improvements in the structure, rolling stock, motor power, and its application, as the commissioners should authorize or approve. Section seven particularly provides, that the act shall not be construed as authorizing the construction of the road along or upon any streets or avenues, except those specified in the act of 1867.
The effect of this act was to secure to the Elevated Railroad Company all the rights, powers, privileges and franchises of the West Side and Yonkers Patent Railroad Company, under the purchase by and transfer to it, and also the right to use any motor power for the propulsion of its cars which the commissioners should authorize or approve. This act did not confer any new franchises upon the Elevated Railroad Company; it only confirmed in it and regulated the franchises previously possessed by the other company. It did not give any new authority to lay down railroad tracks, or grant any exclusive privilege. It only confirmed and regulated authority and privileges previously granted to a company to which the Elevated Railroad Company had succeeded.
By the act of 1867, the railroad company was required to construct the experimental section within one year (legal delays excepted), and the extension thereof as authorized, so far as comprised in the limits of the city of New York, within five years thereafter. These provisions were probably not *Page 338 
complied with. They were conditions for a non-compliance with which the sovereign power could claim a forfeiture of the company's charter. But a cause of forfeiture cannot be taken advantage of or enforced against a corporation collaterally, or incidentally, or in any other mode than by a direct proceeding for that purpose against the corporation; and the government creating the corporation can alone institute the proceeding; and it can waive a forfeiture, and this it can do expressly or by legislative acts recognizing the continued existence of the corporation. (Angell and A. on Corp., 742-47.) I can therefore perceive no constitutional objection against the act of 1875. It did not violate § 18 of Art. 3 of the Constitution which took effect Jan. 1, 1875, and which prohibits the Legislature from passing a private or local bill, among other things granting to any corporation the right to lay down railroad tracks or any exclusive privilege or franchise. These constitutional provisions do not prohibit a private or local bill to amend the charter of private corporation by regulating powers, rights, privileges and franchises which it previously possessed. Such a bill may not be passed to give to an existing corporation any new right to lay down railroad tracks, or any new exclusive privileges or franchises; but it may be passed to regulate and control the right to lay down tracks previously existing, or to give new privileges or franchises, provided they be not exclusive. A bill may be passed waiving a forfeiture of corporate rights. Such a bill would confer no new rights upon the corporation, but would simply be a surrender or waiver by the sovereign of its right to claim the forfeiture. A bill may be passed to extend the time within which corporate rights may be exercised. Such a bill would give no new substantial rights, but would simply extend the time within which rights previously granted could be exercised. So a bill may be passed giving a private railroad corporation the right to use a new or different motive power, provided the right be not exclusive.
Prior to the 18th day of June, 1875, the New York Elevated Railway Company had constructed and was actually *Page 339 
operating an elevated steam railway on a portion of the route authorized by the various acts above referred to, and on that day the act, chapter 606, entitled "An act further to provide for the construction and operation of a steam railway or railways in the counties of the State," the general rapid transit act was passed. That is a general act authorizing the construction of steam railways in all the counties and cities of the State. It provides for the appointment of five commissioners upon the application of fifty householders and taxpayers, showing that there is need of a steam railway. The application is to be made to, and the appointment made by, the board of supervisors of any county in which it is proposed to construct a railway, except when the proposed railway shall be wholly within the limits of any city where the application is to be made to, and the appointment made by, the mayor. Such commissioners must, within fifteen days after their appointment, meet and organize themselves into a board; and within thirty days after such organization they must determine upon the necessity of the proposed steam railway, and, if they find such railway to be necessary, they must, within sixty days after such organization, fix and determine the route or routes for such steam railway. And they have the exclusive power to locate the route or routes of such railway over, under, through or across any streets, avenues, places or lands, with a few exceptions specified, and to provide for the connection or junction with any other railway or bridge, provided that the consent of the owners of one-half in value of the property bounded on, and the consent, also, of the local authorities having control of that portion of a street or highway upon which it is proposed to construct or operate such railway be first obtained, or in case the consent of such property owners cannot be obtained, that the determination of three commissioners appointed by the General Term of the Supreme Court, given after a due hearing of all parties interested, and confirmed by the court, that such railway ought to be constructed or operated, be taken in lieu of the consent of such *Page 340 
property owners. The five commissioners are also required, not more than ninety days after their organization, to decide upon the plans for the construction of the proposed railway, to determine the line within which it shall be constructed and ready for operation, and to fix the amount of the capital stock of the company to be formed for the purpose of constructing and operating such railway.
They are also required to prepare the articles of association for such company, to open a book of subscription to its capital stock, and to superintend the organization of the company. Corporations thus formed have the right to acquire and hold such real estate or interest therein as may be necessary to enable them to construct, maintain, and operate their railways, and in case they cannot purchase the real estate, provisions are made to acquire title to the same by appraisement and compensation under the special proceedings prescribed in the act. Section 26 of the act provides, among other things, that every corporation formed under the act shall have power to enter upon, and beneath the streets and avenues designated by the five commissioners, and to construct and operate its road upon the routes designated by such commissioners, and that such use of the streets and avenues shall be considered a public use, consistent with the uses for which the streets and avenues are publicly held. Section 36 provides that "whenever the route or routes, determined upon by said commissioners, coincide with the route or routes covered by the charter of an existing corporation formed for the purpose provided for by this act, provided that said corporation has not forfeited its charter, or failed to comply with the provisions thereof, requiring the construction of a road or roads within the time prescribed by its charter, such corporation shall have the like powers to construct and operate such railway or railways upon fulfillment of the requirements and conditions imposed by said commissioners as a corporation specially formed under this act; and the said commissioners may fix and determine the route or routes by which any elevated steam railway or railways *Page 341 
now in actual operation may connect with other steam railways, or the depots thereof, or with steam ferries, upon fulfillment by such elevated steam railway company, so far as it relates to such connection, of such of the requirements and conditions imposed by said commissioners under section four of this act, as are necessary to be fulfilled in such cases, under section eighteen of article three of the Constitution of this State, and such connecting elevated railway shall in such cases possess all the powers conferred by section 26 of this act; and when any connecting route or routes shall be so designated, such elevated railway company may construct such connections with all the rights, and with the like effect as though the same had been a part of the original route of such railway."
A proper application under this act, signed by fifty qualified persons, was presented to the mayor of New York, praying for the appointment of commissioners, and he appointed the five commissioners July 1, 1875. They organized as required by the act, and subsequently determined that there was a necessity in the city of New York for a steam railway for the transportation of passengers, mails and freight; and they fixed the routes, under section 36 of the Act, by which the New York Elevated Railroad might connect with other steam railways or the depots thereof, and with steam ferries. The route thus fixed commences at the intersection of Greenwich street and Battery Place, and extends through various streets and avenues to the Harlem river, with connections to all the East river ferries, and with railroad depots, with branches and turnouts. There was also fixed another independent route of connection on the west side of the city, beginning at the intersection of Ninth avenue and West Ninety-Second street, and thence along several streets and avenues to the depots of the New York, Boston and Montreal Railroad, and the Spuyten Duyvel and Port Morris Railroad on the north side of Harlem river. The commissioners subsequently adopted a plan for the construction of an elevated railroad by which these connections were *Page 342 
to be made. The common council consented to the routes thus fixed, and the New York Elevated Railroad Company assented to the action of the commissioners. The New York Elevated Railroad Company having failed to obtain the consent of the owners of one-half in value of the property bounded on the streets and avenues through which the proposed connections were to be made, as required by section 18 of article 3 of the Constitution, on the first day of December, 1875, applied by petition to the General Term of the Supreme Court for the appointment of three commissioners to determine whether the proposed railroad ought to be constructed, and the commissioners were appointed. They investigated the matter, and heard property owners and parties interested, and on the 4th of March, 1876, made a report, in which they determined that the independent route above named, on the west side of the city and connecting with the depots on the north side of Harlem river, ought not to be constructed, but that the other route on the east side of the city ought to be constructed as fixed by the mayor's commissioners. This report was confirmed by an order of the General Term of the Supreme Court, March 16, 1876, and it is this order which is the subject of this appeal.
There are several grave constitutional objections raised to the General Rapid-Transit Act which must first be considered. In considering them, we must keep in view the salutary rule, often reiterated, that nothing but a clear violation of the Constitution will justify a court in overruling the legislative will. Every statute is presumed to be constitutional, and every intendment is in favor of its validity. When a statute is challenged as in conflict with the fundamental law, a clear and substantial conflict must be found to exist to justify its condemnation, but when found, courts must not hesitate to condemn. The Constitution is the voice of the people speaking in their sovereign capacity, and it must be heeded. (Warner v.Beers, 23 Wend., 166; People v. Albertson, 55 N.Y., 54.) *Page 343 
1. Mr. Justice WASHINGTON, in Ogden v. Saunders (12 Wheat., 270), said: "It is but a decent respect due to the wisdom, the integrity and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity, until its violation of the Constitution is proved beyond all reasonable doubt."
It is objected that the act is unconstitutional, because it delegates legislative power to the mayor's commissioners. The object of the act was to provide for the construction of elevated and underground railways. It confers upon the commissioners the power to determine upon the necessity of such railways to fix the routes upon which they may be constructed, to prescribe the plan of their construction, and to superintend the organization of companies for their construction. It provides for the personal liability of the stockholders in such companies, and confers upon them the right to take and hold real estate, and provides particularly how they may acquire the same; it specifies the powers which they shall possess, and the duties and obligations which shall rest upon them. The act rests upon the legislative will, and in no way depends for its vitality upon the action of the commissioners. Corporations organized under the act derive their franchises from the Legislature, and in no proper sense from the commissioners. The commissioners perform no legislative acts; they enact no laws; they simply perform administrative acts in carrying the law into effect and applying it. The Legislature is required by the Constitution to pass general laws for the formation of corporations (art. 3, § 18; art. 8), and it has passed general laws for the formation of all kinds of corporations. In such cases, it does not directly confer corporate franchises; it simply provides the mode in which such franchises may be acquired by those desiring them. Ordinarily, individuals desiring to incorporate under a general law determine for themselves the necessity of a corporation, their corporate name, what business they will carry on, where they will transact it, the amount of their capital and the duration of their corporation. *Page 344 
In making such determinations, it was never supposed that they were engaged in acts of legislation, or that they conferred upon themselves corporate franchises. They simply act under, apply and carry into effect a law in reference to which legislative power has been properly evoked. But suppose, instead of leaving the determination of these matters to individuals, the law provides a tribunal to make the determination for the individuals, is there any more delegation of legislative power to the tribunal than to the individuals, under the general laws as they are now usually framed? Cannot the Legislature confer upon a commission the power, upon the application of individuals, to make the same determination for the individuals which they could make for themselves? The proper answers to these questions are not doubtful. The arguments made to show that the Legislature was not competent to devolve upon these commissioners the powers given to them in this act, if sound and logically applied, would nullify every general law found upon our statute books for the formation of corporations, and thus nullify the Constitution itself, which commands the passage of such general laws.
The Legislature could not in a general law determine the necessity of a railway in any particular locality, nor the routes upon which it was to be constructed, nor the amount of capital, or the name which it was to assume, and there is nothing in any constitutional requirement which imposes upon it the duty in a general law to provide the place of construction for any railroad. It may provide the machinery for the determination of these matters, and what that machinery shall be must depend upon its will. It may authorize these determinations to be made by the individuals who desire to incorporate, by the people resident in the locality to be affected, or by the municipal or county government, and it does not thereby abdicate in any proper sense any part of its legislative power.
2. The claim is made that the entire act is void because it is not a general law. Section 18 of article 3 of the Constitution, *Page 345 
prohibits the passage by the Legislature of private or local bills in many cases, among which are bills "granting to any corporation, association or individual, the right to lay down railroad tracks," and bills "granting to any private corporation, association or individual, any exclusive privilege, immunity or franchise whatever," and then commands the Legislature to pass general laws providing for such cases. It may be conceded, as claimed by the learned counsel for the appellants, that "the practical effect and operation of this law is and must be in every instance local, special, and private." Such is the practical effect and operation of all the general laws for the formation of corporations, except such as are in their nature public. Their object is the formation of private and local corporations, and the command of the Constitution is that such corporations shall be formed under general laws. Under this act railway corporations may be formed, are authorized to be formed in every county, town, village and city in the State, and fifty householders and taxpayers may, anywhere, at any time, institute proceedings for the formation of a corporation under the act. The act is not stripped of the general character thus conferred upon it by the circumstance that local commissioners are to be appointed to carry it into effect. Whether there shall be a permanent board of commissioners to act for the whole State, or a separate board upon each application, can make no difference. The general railroad act allows a few individuals, who may all reside in the same locality, to incorporate themselves for the construction of a railroad. It would be no less a general act if it provided that the incorporation was to be consummated through commissioners appointed from the same locality upon the application of the same individuals who can now under the present law incorporate. This law offers to citizens in all parts of the State, the same opportunities to incorporate under it. It matters not that the corporations formed may not be uniform in all their characteristics. They would be uniform in all their general powers and corporate functions. Corporations formed under *Page 346 
the general manufacturing law are not in all respects uniform. They may differ in the amount of their capital, the number and amount of their shares, the time of their duration, the number and names of their officers, in the nature of their business, in the mode of the transaction of their business, and in many other important particulars. Such is necessarily the case with corporations formed under a general law, and yet their general powers and corporate qualities are the same.
It matters not that every citizen of the State cannot become a corporator in a company to be formed under the act, and that the practical operation of the act is to confine the power to incorporate to a few individuals. The act in form offers the same opportunities to all the citizens of the State. The fact that some are not able to avail themselves of the opportunities does not impugn the general character of the act. When a railroad, under the general railroad law of 1850, is constructed from one point to another, the topography of the country through which it runs may be such as to forbid the construction of another railroad. But one elevated railway can be constructed through the same street, and hence upon any route in a city, but one company for the construction of a railway is practicable; and while the Legislature could not by a private act incorporate such company, the problem for it to solve by the general act was, how such railways could be constructed under a general act authorized by the constitution.
It would not be feasible to permit the formation of several corporations to operate railways in the same streets, nor would it be wise to lease a railway to be constructed by the corporation which by accident was first in time. Nor would the same plan for the construction and operation of railways in all places be practicable. Hence it became the duty of the Legislature by a law, having general operation, to provide machinery which should determine the necessity of a railway, and the streets and places where it should be constructed, the company or organization of individuals which *Page 347 
should construct it, and the plan upon which it should be constructed. While upon any route the franchises are given to one corporation, the formation of that corporation is open to all persons upon the same terms, and no person is excluded from becoming a stockholder therein. The methods adopted in this act seem to be well devised to attain the end sought, and it is quite certain that without some such methods, no elevated or underground railways can be constructed. And this act is not limited in time. While it is true that one set of commissioners can act upon but one application, a new set of commissioners can be appointed whenever any persons desire to form a corporation, and present the proper application. I can therefore entertain no doubt that this is a general act within the meaning of the Constitution.
3. A more serious objection is made that section 36 of the act is in conflict with the Constitution, and the part of that section now to be considered, is repeated as follows: "The said commissioners may fix and determine the route or routes by which any elevated steam railway or railways now in actual operation may connect with other steam railways, or the depots thereof, or with steam ferries, upon fulfillment by such elevated steam railway company, so far as it relates to such connections of such of the requirements and conditions imposed by said commissioners under section four of this act, as are necessary to be fulfilled in such cases under section 18 of art. three of the Constitution of this State; and such connecting elevated railway shall in such case possess all the powers conferred by section 26 of this act. And when any connecting route or routes shall be so designated, such elevated railway company may construct such connection with all the rights, and with like effect as though the same had been a part of the original route of such railway."
No railway company could have the benefit of these provisions except it had an elevated railway in actual operation at the time of the passage of the act, and as to such a company, the commissioners could determine the routes by *Page 348 
which it could make the connections specified, provided it first obtained the consent of the owners of one-half in value of the property bounded on, and the consent of the local authorities having the control of that portion of any street or highway to be used for the route of the connections; or, in case the consent of the property owners could not be obtained, then in lieu thereof the determination of the commissioners to be appointed by the Supreme Court as provided and required in section four of the act, and of section eighteen of article three of the Constitution.
After the routes are thus designated, and the consents obtained, the company has all the powers conferred by section twenty-six of the act, which is the section defining the general powers to be possessed by corporations formed under the act. Among the powers there conferred, is the right to enter upon any streets designated for routes by the commissioners, and to construct thereon a railway upon the plan adopted by the commissioners. Such company has the further power, by the last clause of section 36, to construct the connections, with all the rights and with like effect, as though the same had been a part of the original route of the railway. That is, among other things, it has the power given to it by its charter to institute proceedings to acquire the title to real estate needed for the connecting route, as if it were engaged under its charter in constructing its original road.
This portion of section thirty-six does not grant any exclusive privilege or franchise to any corporation. Any railway company having a railway in actual operation would not have the exclusive right to make the connections specified. The act does not confer upon such railway company even the exclusive right to any street for the route of its road. But the right would not be exclusive within the meaning of the Constitution, even if but one road could be built in any street, so long as other routes were permitted. Roads constructed under this act have not the exclusive right to carry freight and passengers, and there is nothing exclusive in the *Page 349 
mode of their construction or the plan of their operation, and I am unable to see how this act confers upon any railway company existing or to be formed thereunder, any exclusive privilege or franchise more than is conferred by the General Railroad Act of 1850 upon corporations formed under it. The locality and the necessities of the case may be such under that act, as well as under this, that a route may be exclusively occupied by one railroad, yet that is in no way chargeable to the law.
If, then, section thirty-six is in conflict with the Constitution, it is because it is a private or local bill, granting the right to lay down railroad tracks. It must be conceded that a distinct provision in a general law, granting to a specified corporation the right to lay down railroad tracks, might be as much in conflict with the Constitution as if the grant were in a separate private bill. As to such provision, the bill would be a private bill. (People v. Supervisors ofChautauqua Co., 43 N.Y., 10.) The Constitution (sec. 1, art. 8) provides that all general and special laws for the formation of corporations may be altered or repealed; but where a special act was passed prior to 1875, creating a private corporation, an act to amend its charter would be a private one, and it could not therefore, since January 1, 1875, grant the right to lay down railroad tracks. Nothing can be done by the Legislature under the power to alter acts of incorporation which it could not constitutionally do by an original bill.
The Constitution does not forbid the Legislature to grant the right to lay down railroad tracks. It simply forbids that such grant shall be made by private or local bill, and permits it to be made under general laws. The object of these prohibitions in the Constitution were doubtless to prevent the cumbering of the statute books with a mass of private and local bills, to relieve the Legislature from the labor of considering and passing upon such bills, and to remove from the Legislature the corrupting influences which surrounded and were brought to bear upon it, as to such *Page 350 
bills, by persons having personal and selfish interests intensely awakened, at stake.
Prior to 1875 the private bills which could be enacted, usually interested but a few persons and a few members of the Legislature; and hence they were heedlessly passed without much scrutiny or consideration, and it was doubtless also one of the objects of the present constitutional restraints to secure the same ends sought by private or local bills, so far as needful, by general laws, in which the whole people would be interested, and which would therefore receive more careful attention from their legislative representatives. We are therefore brought to the question, were the provisions contained in section thirty-six a general law, within the meaning of the Constitution?
It is not easy to frame a definition of a general law which will be found precisely accurate in every case. A law applicable to all the people of the State, and operating in all parts of the State, would be most general. But a law may be general without affecting all the people of the State. A law regulating the rights of married women, or of minors, or of adults, or of aliens, would be general, and it would be general, although confined to the persons in being at the time of its passage. So, a law conferring new rights upon all existing insurance companies, or railroad companies, or manufacturing companies, would be general. A law which relates to persons or things as a class is general, but one which relates to particular persons or things of a class is special and private. (People v. O'Brien,38 N.Y., 193; White v. Syracuse and Utica R.R. Co., 14 Barb., 559; Cricket v. State, 18 Ohio St., 9; Weller v. Pattee,
18 id., 85; Chicago, B. Q.R.R. Co. v. Cutts, 4 Am. Law T.R., 174; McCormick v. Rusch, 15 Iowa 129; McArenwich v.M. M.R.R. Co., 20 Iowa 343; Iowa R.R. Co. v. Loper,39 Iowa 112; Wheeler v. Philadelphia, 77 Penn., 348.)
A law granting to all horse railway companies, or to all street railway companies, elevated railway companies, the *Page 351 
right to lay down railroad tracks, would be constitutional. It would operate uniformly and generally upon all companies in the same situation and belonging to the same class, and that would make it general.
It seems to be conceded by the learned counsel for the appellants that such a law would be general, if it applied to both existing companies, and such as should thereafter be formed. But I am unable to perceive why a law applicable to existing and future companies should be general, and one confined to existing companies not general. Both laws would, at the time of their enactment, apply to precisely the same existing subjects, and until future companies came into existence, would have precisely the same operation.
But it is claimed that there was but one elevated railway in actual operation at the time of the passage of the act, and hence that it must be deemed that the Legislature had sole reference to that. It was well said by ALLEN, J., in People v. Albertson
(55 N.Y., 50), that "no motive, purpose or intent can be imputed to the Legislature, in the enactment of a law other than such as are apparent upon the face, and to be gathered from the terms of the law itself." Another learned judge of this court has said: "We are not made judges of the motives of the Legislature, and the court will not usurp the inquisitorial office of inquiry into the bona fides of that body in discharging its duties. (People v. Draper, 15 N.Y., 532, 545, 555.) It is not to be presumed or inferred that the Legislature intended to violate or evade the constitutional restraints. The law does not specify any particular elevated steam railway in actual operation, but in its terms applies to any and all such railways anywhere in operation. How are we to know that there was but one in operation at the time of the passage of the act? Can a court take proof for the purpose of showing a statute valid and regular upon its face to be unconstitutional? And does the validity of a law which is required to be general, and which is general in its terms, depend upon the number of subjects upon which it can operate, or upon the size of a *Page 352 
class to which it applies? These questions must be answered in the negative. We do not know and we cannot assume that the Legislature knew that there was but one elevated steam railway in actual operation in this State, at the time of the passage of the act. There had been passed several acts under which such railways could have been constructed. (Chap. 753, of the Laws of 1857; chap. 225, of 1867; chap. 794, of 1869; chap. 795, of 1870; chap's 897, 940, of 1871; chap's 505, 833, of 1872; chap's 275, 443, 558, 585 of 1874.) Under these laws and probably others, elevated steam railways of some length, could have been constructed. We cannot assume or know judicially that no railway under any of these acts was in operation. On the contrary we may assume that the Legislature found there was. (16 Pickering, 87; 26 N.J. Law R., 109.) Hence the postulate upon which the argument for the appellants is largely based, is unauthorized. But the argument need not be rested here. Section thirty-six need not necessarily be treated as if its provisions were contained in a separate, independent act. It is part of a general act, and that act embodies a general scheme for the construction of elevated and underground steam railways. It provides for the formation of new companies for their construction; and where a route designated by the commissioners is coincident with a route upon which an existing company is authorized to construct, such company may construct its road under the act, and any company having an elevated railway in actual operation may construct the connections specified. The act is thus made applicable to companies to be formed, and to existing companies, and is thus made as general as it can be. In any case the constructing company is to comply with the plans prescribed by the commissioners. By what rule of construction are the provisions applicable to existing companies isolated from the rest of the act? They are an appropriate part of the general scheme, and it could make no difference whether there was one or many existing companies. The existing companies have no exclusive privileges or functions conferred. *Page 353 
They are simply placed on a footing of equality with new companies which may be formed under the act.
Suppose a general act should be passed for the construction and operation of railroads with four tracks, and it should contain a provision by which any existing railroad of four tracks could come under the provisions of the act, would it, as to such existing railroad, even if it were the only one, be a private act? The whole act would be a general act applicable to railroads with four tracks.
It is true that this act authorizes existing railways to lay down tracks, but this it does as part of a general scheme devised by the Legislature, and hence it is not unconstitutional. It may be that no new railways will ever be constructed by companies formed under the act, and it may be that the Legislature designed, as alleged, to benefit two elevated railway companies in existence at the time of the passage of the act. But all this can make no difference here, so long as the act in its terms, and possible application, is general. Section 49 of chap. 140, of the Laws of 1850 (the General Railroad Act), makes the provisions of that act generally applicable to existing railroad corporations. It will hardly be claimed that that section, as to existing corporations, is a private act. Its purpose and effect were to bring such corporations under the general scheme devised by a general law. It made the law more general than it otherwise would have been.
It may be that the construction which we have thus given to this act, and particularly to section thirty-six, may leave the way open to great abuses of legislative power, illustrations of which were given in the learned arguments before us. There may be ways for a Legislature to circumvent a constitutional provision without violating it. History shows by many examples, how the spirit of a Constitution may be disregarded, and yet its letter observed. But there is a vital difference between the abuse of legislative power and its exercise in palpable violation of the Constitution. For the former, the remedy is with the people alone, in the choice of *Page 354 
faithful representatives who will respect their will; for the latter, alone, the courts clothed with power always to be exercised with caution, can give as a remedy.
4. It is further claimed that no provision is made in the act for compensation to the owners of property bounded upon the streets in the city of New York through which the New York Elevated Railway Company is authorized to make its connections, and that therefore section thirty-six, so far as relates to this company, is unconstitutional. This claim rests upon the assumption that the abutting owners upon such streets have property rights therein, of which they are to be deprived, and for which they are entitled under the Constitution to compensation. Whether they have such property rights, it will not be necessary to determine upon this appeal, for the reason that provision is made for compensation.
It is true, that under section twenty-six, this company is authorized to construct its railway in the streets designated by the commissioners. But that authority is only the public consent, without which no railway can be built in a street. That section does not authorize interference with the rights of private property. Under the Constitution, before a railway can be constructed in a street, there must be the authority of the Legislature, the consent of the local authorities, and the consent of the owners of one-half in value of the property bounded on the street, or in lieu thereof, the determination of the Supreme Court commissioners; and all this is required, whether there are any private rights of property in the streets or not. If there are such private rights, which are to be taken, within the meaning of the Constitution, then such rights must be taken in pursuance of law, upon making compensation.
The act of 1866 (chap. 697) makes the provisions of the General Railroad Act of 1850, as to acquiring real estate by hostile proceedings, applicable to the company to be formed under that act. The act of 1867 (chap. 489) recites, that the West Side and Yonkers Patent Railway Company was organized and existing under the General Railroad Act and *Page 355 
the several acts amendatory and supplementary thereof, and in section seven it provides, that the company shall be subject to the liabilities, and enjoy the privileges mentioned in these acts, granting corporate powers not inconsistent with the provisions of that act; and that "any private property used or acquired shall be compensated for by said company under provisions of existing laws authorizing the formation of railroad companies, and the acquisition of rights of way therefor."
The act of June 17, 1875, recites, that the New York Elevated Railway Company was organized, incorporated and existing under the General Railroad Act of 1850, and the laws amendatory and in addition thereto; and that it had succeeded to all the rights, powers, privileges and franchises of the West Side and Yonkers Patent Railway Company, under the acts of 1867 and 1868; and it confirms this company in the possession and enjoyment of all such rights, powers, privileges and franchises, and authorizes it to go on and complete its road.
It is thus entirely clear that this company has all the authority conferred in the General Railroad Act to take and acquire real estate for the purposes of its road by the special proceedings provided. And section thirty-six of the Rapid-Transit Act provides, that the elevated railroad company may construct the connecting routes, "with all the rights, and with like effect as though the same had been a part of the original route of such railway." Hence it seeme to me that there is no room for doubt that ample provision is made for compensation for any property rights the abutting owners may have in the streets. I conclude, therefore, that there are no constitutional objections which call for the reversal of the order appealed from, and I now proceed to the examination of the objections made to the proceedings under the act.
Although these objections are quite numerous, I believe they present no serious difficulties, and a brief consideration of them is all that can be required. It will tend to perspicuity *Page 356 
to take them up separately in the order in which they were presented in the argument.
1. It is objected that it did not appear that, at the time of the passage of the Rapid-Transit Act, the New York Elevated Steam Railroad Company was in existence, or that it had any road in actual operation. The act of June 17, 1875, above referred to, shows that this railroad company was in existence, and it was also shown in various ways in the proceedings before both boards of commissioners. Formal proof does not seem to have been made that it had a road in actual operation at the time of the passage of the Rapid-Transit Act. But the mayor's commissioners found that it had. They may have found, and they had a right to find it from their own observation, and the fact was assumed and not disputed in all stages of the proceedings. It was shown by affidavit that, at the time of the hearing before the Supreme Court commissioners, the road was in actual operation, and the plain inference from all the proceedings is, that it was at the time of the passage of the act.
2. The appointment of the Supreme Court commissioners was made without notice to the property owners, and this it is claimed was irregular. Neither the Constitution nor section 4 of the Rapid-Transit Act require that such notice should be given. It was not a proceeding to take property or to deprive any person of his rights, and hence it could be taken without any notice. It was simply a proceeding to constitute a tribunal to hear and determine, and it was clearly intended that no notice should be required, as no hearing of the parties interested is given, while it is specially provided, both in the Constitution and the law, that the parties interested should have a hearing before the commissioners after their appointment.
3. The Constitution and the law require that the determination of the Supreme Court commissioners shall be made after a hearing of all parties interested. They do not provide what notice should be given to the parties, nor how the notice shall be served, nor how the hearing shall be had. *Page 357 
The practice was thus left to be prescribed by the court or the commissioners. That there was to be a hearing implies that there was to be a notice. A personal notice, in view of all contingencies upon the thousand abutting owners, was impracticable. Hence the order of the court required that notice of the time and place for the hearing should be given by publishing the notice in six leading daily newspapers seven times consecutively, and by posting the same in fifty places along the route. The notice was published as ordered, and was posted in one hundred and fourteen places along the route, and was ample within every authority. (Matter of Empire City Bank, 18 N.Y., 199;People v. Smith, 21 id., 595; Happy v. Mosher,
48 id., 313; Tracey v. Corse, 58 id., 143.)
The property owners demanded that the evidence before the commissioners should be oral, and that the witnesses should be produced and cross-examined. The commissioners determined that the proofs might be made by affidavits. In this there was no error. This was not a common law proceeding in which any party was to be deprived of any of his property or his rights. Hence, if a substantial opportunity was given for a hearing, it was all that the Constitution or the law required, and a hearing by affidavit and other written proofs and statements, not unusual in legal proceedings, was sufficient.
It was for the commissioners to determine how much time they would give for the hearing, and so long as they did not abuse their discretion so as to deprive the parties interested of a fair opportunity to be heard, their action is not the subject of review here.
The property owners knew the general plan for the construction of the proposed railway as fixed by the mayor's commissioners and assented to by the railway company, and they had access to the affidavits and proofs furnished on behalf of the company, and hence had all the opportunity for a fair and sufficient hearing which they could properly demand. It is clear that to commissioners residing in the city of New York, and necessarily having much personal *Page 358 
knowledge of the matters to be investigated by them, all the proofs were furnished which could probably have been influential or of service in their determination.
4. It is objected that because the Supreme Court commissioners did not determine that the road ought to be constructed through the entire route designated by the mayor's commissioners, their action was illegal and their report ought not to have been confirmed. The route designated on the west side of the city, was an independent route, having, as I infer, no connection with the route on the east side. The determination of the Supreme Court commissioners was in lieu of the consent of the abutting owners in any street, and hence where a route passed through several streets, I can perceive no reason why they might not determine that the road ought to be constructed in some streets, and not in others, so long as a complete road upon some route was left. In this case, where there were several ferries and depots with which connections were to be made, they might determine that some connections ought, and others ought not to be made.
The Supreme Court commissioners in their determination that the road ought to be constructed, confined its construction to one of the several methods authorized by the mayor's commissioners. In this it is objected that they exceeded their authority. If they did, these appellants cannot complain. The railroad companies had the choice of several methods, and it might possibly complain of being confined by the commissioners to one. But it assented, and the case as to these appellants must, therefore, be treated as if it had voluntarily made the choice. This objection is so satisfactorily answered in the opinion of the General Term that no more need be added here.
5. The only question for the determination of the Supreme Court commissioners was whether the road upon the route designated, ought to be constructed and operated, and this in view of all the circumstances they determined. It matters not that they held that they were not required or *Page 359 
permitted to determine whether the particular route selected, was the best route for the road. The route was to be determined by the mayor's commissioners; and even if that was not the only feasible route or the best route, these commissioners were to determine in view of all the considerations, whether it was to be constructed upon that route. If any better route was left, some other road might at some time be constructed upon that. It was no part of their duty to review the determination of the mayor's commissioners, that the route selected was the best, or at least a proper route.
Whether the benefits to follow from the construction of the road were such as to counterbalance the injury which should be done to private interests from its operation, was a question properly before both sets of commissioners and with their determination of it we cannot or at least ought not upon this appeal to interfere.
6. The further claim is made that the Supreme Court commissioners had no power to act after the expiration of sixty days from the organization of the mayor's commissioners. Those commissioners were appointed July 1st. They were required to organize within fifteen days; within thirty days after the organization, they were to determine upon the necessity of the proposed railroad, and within sixty days they were to fix the route, and they had the whole of the sixty days in which to do it. There could be no action to procure the appointment of the Supreme Court commissioners until after the route was fixed. And such action was not required to be taken within the sixty days. It could, under the Constitution and the law, be taken at any time before the construction or operation of the railroad should be commenced.
I have thus given careful consideration to all the objections to which our attention was called upon the argument of this case, and conclude that there are no constitutional objections to the Rapid-Transit Act, and no valid objections to the proceedings under the act, and that the order appealed from must be affirmed. *Page 360 
ALLEN, J., concurs substantially in the opinion of Judge EARL, and in the result, and was of the opinion that unless the statutes under which the petitioning corporation claimed to exercise its privileges, did make provision for compensation to individuals for every property right and interest, whether corporeal or incorporeal, which would be invaded or appropriated, in the construction and operation of the railway, they could not be sustained. But he was of the opinion that the several acts, as a whole, did make ample provision for such compensation, and that every property right of individuals, including whatever right or interest, by way of easement, appurtenant to these lands or otherwise owners of lots abutting on the streets, have, in such streets, as well those the fee of which is in the city, under the laws of 1813, as the other streets, must, under the Constitution and the statutes, under which these proceedings are had, be compensated for.
He expressed no opinion as to the rights existing in the owners of abutting lands in either class of streets, or to any easements therein other than such as are common to the public, but regarded that question, as well as the measure of damages, if any, to which such property owners would be entitled, especially as to the property rights in the streets, the fee of which is in the city, as open questions, not having been passed upon by the courts, or considered in any case in which the questions were involved.
Subdivision 5 of section 26 of chapter 606 of the laws of 1875, can have full effect without extending its operation to individual rights in the streets, or easements therein, and applying its provisions to the rights of the public. If it goes farther and authorizes the measure of private rights of property of any kind, and the appropriation thereof by the corporations mentioned, without compensation, it is unconstitutional, and therefore void.
CHURCH, Ch. J., concurs with EARL, J.; MILLER, J., concurs in result.
FOLGER, J., dissents. *Page 361 
RAPALLO and ANDREWS, JJ., concur in the opinion of EARL, J., except in that part which holds that the act makes provision for compensation to the owners of lands abutting on streets in the city of New York, and on the ground that no sufficient provision is made for such compensation, they dissent.
Order affirmed.