## N. Y. COMMON PLEAS.

CHARLES F. MATTLAGE agt. THE NEW YORK ELEVATED RAILWAY COMPANY and THE MANHATTAN RAILWAY COMPANY.

*Elevated railroads — No right to place stair-cases or build stations in or over intersecting streets — When owner of building entitled to injunction to prevent the maintenance of such depot.*

Chapter 478 of the Laws of 1867, which authorized the defendants to construct an elevated railroad along both sides of Greenwich street, and on Ninth avenue, or on *streets* west of Ninth avenue, does not empower defendants to place stair-cases or to build stations in or over the streets that intersect the line of the railroad.

*Held,* that the depot in question in Warren street was erected and is now maintained without the authority of law and is a purpresture.

*Held,* further, that the plaintiff falls within that class of sufferers whose injuries are such as to give them individually a right to demand the protection of the court, and his right to an injunction is clear.

The plaintiff by maintaining a wooden awning over the sidewalk does not deprive himself of his right to complain of an unlawful structure that darkens his windows and renders his store unfit for the transaction of his ordinary business.

Nor is the plaintiff guilty of such laches as to disentitle him to an injunction.

*Special Term, July,* 1884.

VAN HOESEN, *J.*— The plaintiff asks that the defendants be enjoined from maintaining a depot that shall extend down

Warren street, beyond the westerly line or side of Greenwich street. If that relief should be denied to him, the plaintiff then asks that he receive compensation for such injuries as the continuance of the depot in its present condition has caused and will hereafter cause him.

The plaintiff is the owner of the house and lot situate on the south-westerly corner of Greenwich and Warren streets, and he conducts upon the premises the business of a dealer in provisions. He bought the property in 1878, and he has occupied it ever since. I think that he owns to the middle line of Warren street, but in his complaint he alleges that "the mayor, aldermen and commonalty of the city of New York acquired their interest therein (i. e., in Warren street), and have ever since held the same, in trust, nevertheless, that the same should be appropriated and kept open for the purposes of a public street forever, and that the legislature has never granted to the defendants any right to use or occupy said street, or any part thereof, for any purpose, or burden the said street with any public use in favor of said defendants."

Although there be no allegation that the fee of the street is in the city of New York, it was assumed upon the trial, at least by the counsel for the defendants, that the complaint, fairly construed, amounted to an admission that the city owned the fee of the street, and that the plaintiff had only such an easement therein as was appurtenant to his rights as an abutting owner. Upon the argument, the counsel for the plaintiff contended that his client was the owner of the street, and the counsel for the defendants then said that he was surprised by that claim, as the evidence had been taken by both parties upon the assumption that the city, and not the plaintiff, had the title to the street. As I understood the counsel for the plaintiff at an early stage of the trial, when a question was raised as to whether or not the fee of the street was in the plaintiff, he said he considered the matter of small consequence, because whether his client owned the fee or whether he had merely an easement, he was in either case entitled to an

injunction.   If my memory be correct, there was not an
unqualified concession that the fee was in the city of New
York, but there was good ground for the argument of the
counsel for the defendants that the allegation that the city
held the street "in trust" was tantamount to an admission
that the city had the legal title to the land of the street.   I
shall treat the case, therefore, as if the plaintiff had no other
rights in Warren street than those of an abutting owner.   I
shall first inquire what the defendants have. done; secondly,
whether they had any lawful authority for their proceedings;
and thirdly, what redress, if any, the plaintiff may be entitled to.

It is conceded that the defendants entered the vault under
the sidewalk of the plaintiff's building, and there built two
piers for the support of iron columns that stand upon the
sidewalk and form part of the underpinning of the structure,
which, in the complaint, is called a depot.   The depot stands
entirely in Warren street.   The house that is used for the sale
of tickets is twenty feet wide by thirty-six feet deep, and is a
substantial structure of wood and iron.   Its floor is on a level
with the plaintiff's second story windows, and its roof is nearly
as high as the roof of the plaintiff's house.   The roof projects
over the sides of the ticket office so as to cover Warren street
from curb to curb.   The carriage-way in Warren street for
more than forty feet is completely roofed by the defendant's
structure.   As may be expected, this structure, parallel to the
plaintiff's building, equal to it in height, and close to its side,
intercepts the light that naturally would enter the plaintiff's
windows, and darkens the interior of the house.   The store,
which is on the ground floor, can no longer be used for some
of the purposes for which it was available before the depot
was built.   The grading of fish (an important part of the
plaintiff's business) cannot be done because there is not now
light sufficient for the work.   Whilst the light has been taken
from the store, the piers built in the vault have diminished
the space usable for the storing and handling of goods.   The
greater part of the piers is within the curb-stone line, and

within that part of the vault of which (it may be assumed as against a wrong-doer) the plaintiff was in lawful occupation.

Now, the construction of piers in his vault and the erection of a house thereon are wrongful acts, unless the defendants had lawful authority for the building of this structure in Warren street. Chapter 489 of the Laws of 1867 authorized the construction of an elevated railroad along both sides of Greenwich street, west of Ninth avenue, to the Harlem river. The road was to run along Greenwich street, at all events, but it was not determined by the legislature whether it was to run on Ninth avenue or on " *streets* west of Ninth avenue." The reason for my emphasizing the word streets will appear hereafter. The act authorized the appointment of three commissioners, who should have power to remove obstructions, awnings, signs and other local objects ; to designate the points at which stair-cases in the streets should be erected for public access to the railway, and at which turnouts and connections between the tracks should be made.

The counsel for the defendants contends that the authority of the commissioners to designate the points in the *streets* in which stair-cases should be erected confers upon them the power to order the construction of stair-cases in any of the cross streets that the railroad intersects ; but such is not, in my opinion, the meaning of the act. The word "streets" must refer to those streets in which the railroad was to lay its track. No other streets are mentioned. The power to use other streets is not expressly given, nor is it given by necessary implication. We have become so accustomed to find stations of the elevated railroads at the corners of streets that the mind, from the force of habit, is inclined to take it for granted that a station must needs be on a corner, but this is by no means so. Stations have been located at corners partly because those places are convenient, and partly, I suspect, because they presented an inviting field to those who wished to occupy land without paying for it. The law-making power evidently did not contemplate the use of the streets for depot

purposes, for the act expressly provides that the railroad company may "rent, purchase or acquire such *buildings* or *parts of buildings* as may be convenient for the stations or depots for public access to the railway."

It will be seen that stations and depots are to be in buildings that the railroad company may hire or buy, though staircases may be erected in the streets through which the track is laid. In all probability, it never occurred to the legislature that the ticket offices of the company would be built over the highway. As a matter of fact, we know that other railways, both horse and steam, sell tickets and receive passengers, without building depots in the highway, middle of public thoroughfares. What necessity, then, can there be for placing the offices of the defendants in the highway? As far as the act of 1867 is concerned, it does not empower the defendants to place stair-cases or to build stations in or over the streets that intersect the line of the railroad.

With respect to the right of the company to excavate "spaces required for the foundation of its columns," section 6 of the act expressly provides that it shall be exercised "within the streets indicated." Those streets, as I have already said, are those through which the track is to be laid. There is no other act to which my attention has been called that enlarges the powers of the defendants with respect to its depots and columns.

The learned counsel for the defendants, without mentioning any particular section of chapter 606 of the Laws of 1875, said generally that that act in some way gave some right to the defendants to use side streets for depot purposes, but I cannot discover any provision that has the least connection with the manner of constructing the railroad in Greenwich street. The commissioners were appointed under the act of 1867, and who continued in office until after the completion of the Greenwich street road, and who may still be acting, when they gave their certificate of approval of the location of the railroad, and of the manner in which it had been built,

say that they were acting under the act of 1867, and under the act chapter 595 of the Laws of 1875. They did not suppose that they derived any power from chapter 606 of the Laws of 1875, nor can I see how that act can be so construed as to confer any authority upon them.

Chapter 595 of the Laws of 1875, is said, however, to cover the case completely, and to remove all doubt as to the right of the defendants to maintain their depot at Warren street as ·it now stands. Section 4 of that act provides that " the location of the lines or routes not specifically located by law, and the position and construction of the tracks, side-tracks, turnouts, stations and *other structures, which said company is or may be authorized by law* to construct, may be such as said company may adopt and the said commissioners approve."

It is urged that the company has adopted this station, and that the commissioners have approved it. Undoubtedly this is true; but is it true that the company was authorized by law to locate the station in its present position, and to construct it in the highway? First, let me read section 7 of the act, which declares that " this act shall not be so construed as to authorize the building or extension of said road through, *along* or *upon* any streets or avenues except along *Greenwich* street to *Ninth* avenue, and along Ninth avenue, or streets west of Ninth avenue, as authorized by section 4 of chapter 489 of the Laws of 1867." Is the depot a part of the railroad? If it be, then there is a positive legislative declaration that the building of it *along* or *upon* any street except Greenwich street, Ninth avenue, or streets west of Ninth avenue is without authority of law.

But this is not all. The court of appeals in the *New York Elevated Railroad Case* (70 *N. Y.*, 327) decided that the act of 1875 conferred no new franchise upon the New York Elevated Railroad Company, but simply confirmed such franchises as were granted by the act of 1867; and that the act of 1875 would have been unconstitutional if it had given any new right to lay down tracks or any new privilege to use the

**238** NEW YORK PRACTICE REPORTS.

Mattlage agt. N. Y. Elevated Railway Co. and Manhattan Railway Co.

streets for the private purposes of the company. The power of the defendants to build and maintain this depot must be found in the act of 1867, if it exist at all, and that act does not confer it. It follows, therefore, that the depot was erected, and is now maintained without the authority of law, and is a purpresture.

Now, to what redress is the plaintiff entitled? As the depot is a common nuisance, an indictment is the only remedy for its abatement, unless the plaintiff has sustained some injury, not merely greater in degree, but different in kind from that suffered by the community at large.

I think that he falls within the class of sufferers whose injuries are such as to give them individually a right to demand the protection of the court. The people at large may, whilst passing in this locality, experience a sense of annoyance at having this structure over their heads and at being impeded by the columns, but it does not appear that they are injured in purse or in person by the obstruction. The plaintiff, on the other hand, suffers a pecuniary loss through the injury to his business that the darkening of his windows occasions. He was bound to prove, and he has shown to my satisfaction, that the building of the depot has prevented him from carrying out his business as beneficially and profitably as he had previously done. The necessity that he is now under of carrying his goods out to the sidewalk in order to grade them, and the expense that the extra handling causes to him, make out a case of special damage that gives the plaintiff a right to maintain an action. If I were sitting to assess damages, I would give to the plaintiff substantial damages for the loss of light. Under these circumstances the right of the plaintiff to an injunction is clear (*Back* agt. *Stacy*, 2 *C. & P.*, 466 ; *Aynsley* agt. *Glover*, 11 *Moak's Eng.*, 528). "Where substantial damages would be given at law, there a court of equity will interpose," said vice chancellor Wood in *Dent* agt. *Auction Mart Company*

NEW YORK PRACTICE REPORTS.        239

Mattlage agt. N. Y. Elevated Railway Co. and Manhattan Railway Co.

(*L. R.*, 2 *Eq.*, 245) and in *Aynsley* agt. *Glover* (*sup.*) the master of the rolls adopted the rule.

To the granting of an injunction the defendants raise several objections that are not founded on their alleged right to build the depot.

*First.* It is said that the plaintiff himself obscures the light by maintaining a wooden awning over the sidewalk, and that he therefore combines with the defendants in darkening the store so as to make himself a contributor to his own injury. Indeed, the counsel called it a case of contributory negligence, though I confess I cannot see how he contributed to the erection of the depot, which is the grievance which the court is asked to redress. It is proved that the awning did not darken the store so as to prevent the plaintiff from carrying on his business in any part of the premises, and the rule is that " a plaintiff, who, in an insignificant degree, obscures the light of his own dwelling house, is not disentitled to an injunction to restrain the defendant from erecting a building that will seriously diminish the light, and that nothing short of an act by the plaintiff that will produce somewhat the same amount of injury as that of which he complains will deprive him of the right to relief" (*Arcedeckne* agt. *Kelk*, 2 *Giff.*, 283). Casting aside all decisions and relying on common sense, is it not clear that by building a shelter from the sun a man does not deprive himself of his right to complain of an unlawful structure that darkens his windows? The awning was intended to exclude some of the sun's rays, even though the store might be somewhat darkened, but I do not draw from that fact the conclusion that if a man fails to make full use at all times of all the light that the sun would give him, he thereby places himself at the mercy of any one who chooses to obscure his windows (*Moore* agt. *Hall*, 28 *Moak*, 164).

*Secondly.* It is said that the light of which the plaintiff is deprived is not direct but only reflected light, and a sort of scientific inquiry was pursued to show at what angles the rays of the sun would strike the walls of the plaintiff's building.

I attach but little importance to theories of that character when we have before us proof that enough of the sun's rays were in some way intercepted to render the plaintiff's store unfit for the transaction of his ordinary business. We have not in this country any such statute as the Metropolis Local Management Act (*chap.* 102 *of* 25 *and* 26 *Vict.*), and an inquiry as to the angles at which light may fall has no place in our system of administering the law (*Theed* agt. *Debenham*, 16 *Moak*, 712; *Hackett* agt. *Baiss*, 15 *Moak*, 459).

*Thirdly.* It is said that the plaintiff is by reason of his laches disentitled to an injunction. If the question here was as to the right of the plaintiff to compel the removal of the piers in his vault, I should acquiesce in the justice of the defendants' position. It was the duty of the plaintiff, when the defendants invaded his vault, to meet them at the threshold with the weapons of defense that the law had placed within his reach. The law is the same to-day that it was on the day when the vault was first encroached upon. He himself is to blame for permitting his premises to be used for the foundation of the defendant's piers. Saying nothing as to his right to damages in an action at law, I should certainly deny to him a mandatory injunction. He knew when the foundations were dug exactly the nature and extent of the encroachment upon his vault.

With respect to the station on the street, however, the plaintiff stands in a very different position. It was not upon his property. The extent to which it would darken his windows, if, indeed, it should darken them at all, was something that he could not possibly know until the structure had been completed. He had only an easement to protect, and that he was in no position to defend until it was certain to be injured. The rule in *Cooper* agt. *Hubbuck* (30 *Beavan*, 160), that was referred to in the *Ninth Avenue case* (3 *Abb. N. C.*, 358), is applicable only where the structure that it is sought to remove by mandatory injunction was one that obviously would necessarily injure the plaintiff if it were allowed to go on to com-

pletion.   Until this depot was completed the plaintiff had no right to assume that it would be so constructed as to darken his windows.   There can be no doubt that when he discovered the effect that the structure would have upon his building the plaintiff moved with the greatest promptitude.

No facts have been presented to me that bring this case within the rule laid down in *Currier's Company* agt. *Corbett* (2 *Dr. & Sm.*, 360), and the plaintiff should have the relief prayed for and the structure erected by the defendants in Warren street should be removed.

Judgment for the plaintiff, with costs.