## ARGUED AND DETERMINED

### IN THE

# COURT OF COMMON PLEAS,

### FOR THE

## CITY AND COUNTY OF NEW YORK.

CHARLES F. MATTLAGE, Respondent, *against* THE NEW
YORK ELEVATED RAILROAD COMPANY *et al.*, Appel-
lants.

(Decided January 16th, 1885.)

The act of 1867, authorizing the construction of an elevated railway in
the City of New York, " along both sides of Greenwich Street to
Ninth Avenue, and along both sides of Ninth Avenue, or streets west
of Ninth Avenue," providing for the appointment of commissioners
with power to authorize the removal of obstructions, etc., to desig-
nate the points at which staircases in the streets should be erected
for public access to the railway, etc., and authorizing the railway
company to " rent, purchase, or acquire such buildings or parts of
buildings as may be convenient for the stations or depots for public
access to the railway " (L. 1867 c. 489), did not empower the railway
company to build stations or to place stairways in or over any streets
other than those in which it was authorized to lay its tracks.

Neither was power to do so conferred by the provisions of the act of
1875 that the company might make and adopt such alterations and
improvements in the structures, etc., as the commissioners might
authorize or approve, and that " the position and construction of the
tracks, . . . stations, and other structures, which said company is or
may be authorized by law to construct, may be such as said company
may adopt and the said commissioners approve " (L. 1875 c. 595).

Mattlage *v.* New York Elevated R. Co.

That act did not confer any new franchise, but only confirmed and regulated franchises previously granted.

Defendants, successors to the company to which the franchise was granted, erected, adjacent to the railway track, but wholly in another street intersecting Greenwich Street, a station, opposite plaintiff's building, parallel to it, equal to it in height, and so close to it as to intercept the light and darken its interior to such an extent as to prevent plaintiff from carrying on his business in it as beneficially and profitably as he had previously done. *Held,* that his pecuniary loss thereby was such special damage that he might maintain an action to perpetually restrain defendants from erecting or maintaining such station, and to compel its removal. And whether plaintiff was the owner of the fee to the middle of such street, or had only an easement therein as an abutting owner, was immaterial.

The fact that plaintiff himself, by maintaining a wooden awning over the sidewalk, somewhat darkened his building, though not so much as to prevent him from carrying on his business in any part of it, could not deprive him of the right to relief against defendants' unlawful structure.

APPEAL from a judgment of this court entered upon the decision of the court at a trial without a jury.

The facts are stated in the following opinion rendered upon the trial of the action at the Equity Term.

VAN HOESEN, J. — The plaintiff asks that the defendants be enjoined from maintaining a depot that shall extend down Warren Street, beyond the westerly line or side of Greenwich Street. If that relief should be denied to him, the plaintiff then asks that he receive compensation for such injuries as the continuance of the depot in its present condition has caused and will hereafter cause him.

The plaintiff is the owner of the house and lot situate on the southwesterly corner of Greenwich and Warren streets, and he conducts upon the premises the business of a dealer in provisions. He bought the property in 1878, and he has occupied it ever since. I think that he owns to the middle line of Warren Street, but in his complaint he alleges that "the Mayor, Aldermen, and Commonalty of the City of New York acquired their interest therein (*i.e.*, in Warren Street), and have ever since held the same, in trust, never-

theless, that the same should be appropriated and kept open for the purposes of a public street forever, and that the legislature has never granted to the defendants any right to use or occupy said street, or any part thereof, for any purpose, nor burdened the said street with any public use in favor of said defendants."

Although there be no allegation that the fee of the street is in the City of New York, it was assumed upon the trial, at least by the counsel for the defendants, that the complaint, fairly construed, amounted to an admission that the city owned the fee of the street, and that the plaintiff had only such an easement therein as was appurtenant to his rights as an abutting owner.

Upon the argument the counsel for the plaintiff contended that his client was the owner of the fee of the street, and the counsel for the defendants then said that he was surprised by that claim, as the evidence had been taken by both parties upon the assumption that the city, and not the plaintiff, had the title to the street.

As I understood the counsel for the plaintiff at an early stage of the trial, when a question was raised as to whether or not the fee of the street was in the plaintiff, he said he considered the matter of small consequence, because whether his client owned the fee, or whether he had merely an easement, he was, in either case, entitled to an injunction.

If my memory be correct, there was not an unqualified concession that the fee was in the City of New York, but there was good ground for the argument of the counsel for the defendants that the allegation that the city held the street " in trust " was tantamount to an admission that the city had the legal title to the land of the street.

I shall treat the case, therefore, as if the plaintiff had no other rights in Warren Street than those of an abutting owner. I shall first inquire what the defendants have done ; secondly, whether they had any lawful authority for their proceedings ; thirdly, what redress, if any, the plaintiff may be entitled to.

It is not contested that the defendants entered the vault under the sidewalk of the plaintiff's building, and there built two piers for the support of iron columns that stand upon the sidewalk and form part of the underpinning of the structure which in the complaint is called a depot. The depot stands entirely in Warren Street. The house that is used for the sale of tickets is twenty feet wide by thirty-six feet deep, and is a substantial structure of wood and iron, its floor is on a level with the plaintiff's second story windows, and its roof is nearly as high as the roof of the plaintiff's house. The roof projects over the sides of the ticket-office so as to cover Warren Street from curb to curb. The carriage way in Warren Street for more than forty feet is completely roofed by the defendant's structure. As may be expected, this structure, parallel to the plaintiff's building, equal to it in height, and close to its side, intercepts the light that naturally would enter the plaintiff's windows, and darkens the interior of the house. The store, which is on the ground floor, can no longer be used for some of the purposes for which it was available before the depot was built. The grading of fish (an important part of the plaintiff's business) cannot be done because there is not now light sufficient for the work.

Whilst the light has been taken from the store, the piers built in the vault have diminished the space available for the storing and the handling of goods. The greater part of the piers is within the curb-stone line, and within that part of the vault of which (it may be assumed, as against a wrong-doer, that) the plaintiff was in lawful occupation.

Now, the construction of piers in his vault and the erection of a house thereon are wrongful acts unless the defendants had lawful authority for the building of this structure in Warren Street.

Chapter 489 of the Laws of 1867 authorizes the construction of an elevated railroad along "both sides of Greenwich Street to Ninth Avenue, and along both sides of Ninth Avenue or streets west of Ninth Avenue to the Harlem River. The road was to run along Greenwich Street, at

all events; but it was not determined by the legislature whether it was to run on Ninth Avenue or on "streets west of Ninth Avenue." The reason for my emphasizing the word *streets* will appear hereafter.

The act authorized the appointment of three commissioners, who should have power to remove obstructions, awnings, signs, and other local objects; to designate the points at which staircases in the street should be erected for public access to the railway, and at which turnouts and connections between the tracks should be made. The counsel for the defendants contends that the authority of the commissioners to designate the points in the "streets" in which staircases should be erected, confers upon them the power to order the construction of staircases in any of the cross streets that the railroad intersects; but such is not, in my opinion, the meaning of the act. The word *streets* must refer to those streets in which the railroad was to lay its track. No other streets are mentioned. The power to use other streets is not expressly given, nor is it given by necessary implication.

We have become so accustomed to find stations of the elevated railroads at the corners of the streets that the mind, from the force of habit, is inclined to take it for granted that a station must needs be on a corner, but this is by no means so. Stations have been located at corners partly because those places are convenient, and partly, I suspect, because they presented an inviting field to those who wished to occupy land without paying for it.

The law-making power evidently did not contemplate the use of the streets for depot purposes, for the act expressly provides that the railroad company may "rent, purchase, or acquire such buildings or parts of buildings as may be convenient for the stations or depots for public access to the railway."

It will be seen that stations and depots are to be in buildings that the railroad company may hire or buy, though staircases may be erected in the streets through which the track is laid. In all probability it never occurred to the legislature that the ticket offices of the company would be

built over the highway. As a matter of fact, we know that other railways, both horse and steam, sell tickets and receive passengers without building depots in the highway middle of public thoroughfares. What necessity, then, can there be for placing the offices of the defendants in the highway? As far as the act of 1867 is concerned, it does not empower the defendants to place staircases or to build stations in or over the streets that intersect the line of the railroad.

With respect to the right of the company to excavate "spaces required for the foundation of its columns," section 6 of the act expressly provides that it shall be exercised "within the streets indicated." Those streets, as I have already said, are those through which the track is to be laid.

There is no other act to which my attention has been called that enlarges the powers of the defendants with respect to its depots and columns. The learned counsel for the defendants, without mentioning any particular section of chapter 606 of the Laws of 1875, said generally that that act in some way gave some right to the defendants to use the side streets for depot purposes, but I cannot discover any provision that has the least connection with the manner of constructing the railroad in Greenwich Street. The commissioners who were appointed under the act of 1867, and who continued in office until after the completion of the Greenwich Street road, and who may still be acting, when they gave their certificate of approval of the location of the railroad, and of the manner in which it had been built, say that they were acting under the act of 1867, and under the act chapter 595 of the Laws of 1875.

They did not suppose that they derived any power from chapter 606 of the Laws of 1875, nor can I see how that act can be so construed as to confer any authority upon them.

Chapter 595 of the Laws of 1875 is said, however, to cover the case completely, and to remove all doubt as to the rights of the defendants to maintain their depot at Warren Street as it now stands. Section 4 of that act pro-

vides that "the location of the lines or routes not specifically located by law, and the position and construction of the tracks, side-tracks, turnouts, stations, and other structures, which said company is or may be authorized by law to construct, may be such as said company may adopt and the said commissioners approve."

It is argued that the company had adopted this station, and that the commissioners have approved it. Undoubtedly this is true; but is it true that the company was authorized by law to locate the station in its present position, and to construct it in the highway?

First, let me read section 7 of the act, which declares that "this act shall not be so construed as to authorize the building or extension of said road through, along, or upon any streets or avenues except along Greenwich Street to Ninth Avenue, and along Ninth Avenue or streets west of Ninth Avenue, as authorized by section 4 of chapter 489 of the Laws of 1867."

Is the depot a part of the railroad? If it be, then there is a positive legislative declaration that the building of it along or upon any street, except Greenwich Street, Ninth Avenue, or streets west of Ninth Avenue, is without authority of law.

But this is not all. The Court of Appeals, in the New York Elevated Railroad Case (70 N. Y. 327), decided that the act of 1875 conferred no new franchise upon the New York Elevated Railroad Company, but simply confirmed such franchises as were granted by the act of 1867; and that the act of 1875 would have been unconstitutional if it had given any new right to lay down tracks or any new privilege to use the streets for the private purposes of the company.

The power of the defendants to build and maintain this depot must be found in the act of 1867 if it exists at all; and that act does not confer it. It follows, therefore, that the depot was erected, and is now maintained, without the authority of law, and is a purpresture.

Now, to what redress is the plaintiff entitled? As the

depot is a common nuisance, an indictment is the only remedy for its abatement, unless the plaintiff has sustained some injury, not merely greater in degree, but different in kind from that suffered by the community at large.

I think that he falls within the class of sufferers whose injuries are such as to give them individually a right to demand the protection of the court.

The people at large may, whilst passing in this locality, experience a sense of annoyance at having this structure over their heads and at being impeded by the columns, but it does not appear that they are injured in purse or in person by the obstruction. The plaintiff, on the other hand, suffers a pecuniary loss through the injury to his business that the darkening of his windows occasions. He was bound to prove, and he has shown to my satisfaction, that the building of the depot has prevented him from carrying on his business as beneficially and profitably as he had previously done. The necessity that he is now under of carrying his goods out to the sidewalk in order to grade them, and the expense that the extra handling causes to him, make out a case of special damage that gives the plaintiff a right to maintain an action.

If I were sitting to assess damages, I would give to the plaintiff substantial damages for the loss of light.

Under these circumstances, the right of the plaintiff to an injunction is clear (*Back* v. *Stacy*, 2 Carr. & P. 466; *Aynsley* v. *Glover*, 11 Moak Eng. 528).

" Where substantial damage would be given at law, there a court of equity will interpose," said Vice-Chancellor WOOD, in *Dent* v. *Auction Mart Co.* (L. R. 2 Eq. 245), and in *Aynsley* v. *Glover* (*supra*).

The Master of the Rolls adopted that rule.

To the granting of an injunction the defendants raise several objections that are not founded on their alleged right to build the depot.

*First.* — It is said that the plaintiff himself obscures the light by maintaining a wooden awning over the sidewalk, and that he therefore combines with the defendants in

darkening the store, so as to make himself a contributor to his own injury. Indeed, the counsel called it a case of contributory negligence, though I confess I cannot see how he contributed to the erection of the depot, which is the grievance that the court is asked to redress.

It is proved that the awning did not darken the store so as to prevent the plaintiff from carrying on his business in any part of the premises, and the rule is that "a plaintiff, who in an insignificant degree obscures the light of his own dwelling-house, is not disentitled to an injunction to restrain the defendant from erecting a building that will seriously diminish the light; and that nothing short of an act by the plaintiff that will produce somewhat the same amount of injury as that of which he complains, will deprive him of the right to relief" (*Arcedeckne* v. *Keek*, 2 Giff. 683).

Casting aside all decisions and relying upon common sense, is it not clear that by building a shelter from the sun a man does not deprive himself of his right to complain of an unlawful structure that darkens his windows? The awning was intended to exclude some of the sun's rays, even though the store might be somewhat darkened; but I do not draw from that fact the conclusion that if a man fails to make full use at all times of all the light that the sun would give him, he thereby places himself at the mercy of any one who chooses to obscure his windows (*Moore* v. *Hall*, 28 Moak Eng. 164).

*Secondly.* — It is said that the light of which the plaintiff is deprived is not direct, but only reflected light, and a sort of scientific inquiry was pursued to show at what angles the rays of the sun would strike the walls of the plaintiff's building. I attach but little importance to theories of that character when we have before us proof that enough of the sun's rays were in some way intercepted to render the plaintiff's store unfit for the transaction of his ordinary business.

We have not in this country any such statute as the Metropolis Local Management Act (25 & 26 Vict. c. 102), and an inquiry as to the angles at which light may fall

has no place in our system of administering the law (*Theed
v. Debenham*, 16 Moak Eng. 712 ; *Hackett* v. *Baiss*, 15· Moak
Eng. 459).

*Thirdly.* — It is said that the plaintiff is by reason of his
laches disentitled to an injunction.  If the question here
was as to the right of the plaintiff to compel the removal of
the piers in his vault, I should acquiesce in the justice of
the defendants' position.

It was the duty of the plaintiff, when the defendants
invaded his vault, to meet them at the threshold with the
weapons of defense that the law had placed within his
reach.  The law is the same to-day that it was on the day
when the vault was first encroached upon.  He himself is
to blame for permitting his premises to be used for the
foundation of the· defendants' piers.  Saying nothing as to
his right to damages in an action at law, I should certainly
deny to him a mandatory injunction.  He knew when the
foundations were dug exactly the nature and extent of the
encroachment upon his vault.

With respect to the station in the street, however, the
plaintiff stands in a very different position.  It was not
upon his property.  The extent to which it would darken
his windows, if indeed it should darken them at all, was
something that he could not possibly know until the struc-
ture had been completed.

He had only an easement to protect, and that he was in
no position to defend until it was certain to be injured.  The
rule in *Cooper* v. *Hubbuck* (30 Beav. 160), that was referred
to in the Ninth Avenue Case (3 Abb. New Cas. 358), is
applicable only where the structure that it is sought to
remove by mandatory injunction was one that obviously
would necessarily injure the plaintiff if it were allowed to
go on to completion.  Until this depot was completed ·the
plaintiff had no right to assume that it would be so con-
structed as to darken his windows.  There can be no doubt
that when he discovered the effect that the structure would
have upon his building the plaintiff moved with the greatest
promptitude.

No facts have been presented to me to bring this case within the rule laid down in *Curriers Co.* v. *Corbett* (2 Drew. & Sm. 35), and the plaintiff should have the relief prayed for, and the structure erected by the defendants in Warren Street should be removed.

Judgment for plaintiff, with costs.

From the judgment entered on this decision defendants appealed.

*David Dudley Field* and *Henry H. Anderson*, for appellants.

*Charles D. Ridgway*, for respondent.

LARREMORE, J. — This is an appeal from an order of this court made July 28th, 1884, adjudging that the defendants and their officers and agents be perpetually enjoined and restrained from erecting, using, or maintaining any station, depot building, or other structure, in Warren Street, opposite or adjoining the plaintiff's premises situate on the southwest corner of Greenwich and Warren Streets in the City of New York, or from entering into or upon Warren Street opposite or adjoining the plaintiff's premises for the purpose of occupying any part of said street in the operation and maintenance of their said railroad. The order further directs the removal from Warren Street of the station or depot now erected and used therein opposite plaintiff's premises, within six months after the service of a copy of the judgment in the action. It further directs that the plaintiff recover of the defendants the damages he has sustained by the erection and maintenance of said depot or station, and his costs of the action.

By Chapter 489 of the Laws of 1867, the West Side & Yonkers Patent Railway Company, a corporation duly organized by statute under an act entitled "An Act to authorize the formation of railroad corporations and to regulate the same," was authorized and empowered to commence and proceed with the construction of an elevated [so called]

railway, in the counties of New York and Westchester, in the manner and upon the route hereinafter specified. Section 2 of that act provides that the structure shall consist of a single track upon opposite sides of the streets, and shall be supported by a series of iron columns along the curbstone line between the sidewalk and carriage way. Section 3 provides for the construction of an experimental section; and section 4 provides that, upon compliance with the requirements of preceding sections, and upon filing of the certificate authorized by the act, the company is authorized to extend its line of elevated railway, as aforesaid, along both sides of Greenwich Street to Ninth Avenue. The act also provides for the appointment of commissioners with powers to authorize the constructing company to remove obstructions which may exist in its route, to direct a removal and replacement of awnings, frames, signs, and other local objects heretofore permitted in the streets, to designate the points at which staircases may be erected and where turnouts between the tracks may be placed, etc. The company was authorized to excavate spaces required for the foundation of its columns within the streets indicated. Section 7 confers authority upon the company to rent, purchase, or acquire such buildings or parts thereof as may be convenient for the stations or depots for public access to the railway. The road was not completed within the five years prescribed by the statute, and in 1875 an act was passed (L. 1875 c. 595), whereby the New York Elevated Railroad Company, as the successor of The West Side and Yonkers Patent Railway Company, was empowered to construct a road within five years from the passage of that act, along and over the streets and places specified and permitted in the aforementioned acts in the mode, manner, and form prescribed by said acts, except as therein otherwise provided. The commissioners for the appointment of whom the act of 1867 provided, were continued by the act of 1875 with the same power. By section 4 of the act of June 17th, 1875, it was provided that the company might make and adopt such alterations and improvements in the structure,

Mattlage *v*. New York Elevated R. Co.

rolling stock, motor power and its application, and in the position, grade, elevation and depression of the tracks, and the mode of securing and strengthening its railroads and stations as the said commissioners or a majority of them might authorize or approve; and "the location of the lines or routes not specifically located by law, and the position and construction of the tracks, side tracks, turnouts, stations, and other structures, which said company is or may be authorized by law to construct, may be such as said company may adopt and the said commissioners approve."

Under the section last referred to, the appellants claim the right to erect and the power to maintain the station complained of.

But the statute does not seem broad enough to confer such authority. The alterations and improvements authorized by it in the mode of securing and strengthening its railroads, sideways and crossings, stations and turnouts, do not authorize them to go out of Greenwich Street. Nor can this be implied from the language employed. If they were authorized by such a construction of the statute to build a depot in Warren Street, then with like authority they might build depots in every street adjoining Greenwich Street along their route. This conclusion is strengthened by the language employed by section 7 of the act of 1875, which provides that it shall not be so construed as to authorize the building or extension of. their said road through, along, or upon any streets or avenues, except along Greenwich Street to Ninth Avenue, as authorized by section 4 of chapter 489, Laws of 1867.

The act of June 17th, 1875, has received judicial construction in the *Matter of the Petition of the New York Elevated Railroad Company* (70 N. Y. 37), wherein it was held that said act did not confer any new franchise upon the company, it only confirmed it in and regulated franchises previously possessed by the other company. It did not give it any new authority to lay down railroad tracks or grant any exclusive privilege not previously granted to the previous company.

The authority of the commissioners under these acts was simply as to the matter of supervision and detail, and any assumption on their part to act under the Rapid Transit Act of 1875 would not support the defendants' claim. Subdivision 5 of section 26 of the act of 1875, after defining the powers to be possessed by the companies, adds, "but no such corporation shall have the right to acquire the use or occupancy of public parks or squares in such county, or use or occupancy of any of the streets or avenues except such as may have been designated for the route or routes of such railway, and except such temporary routes of such railway and except such temporary privileges as the proper authorities may grant to such corporations to facilitate such constructions."

Having reached this conclusion, it is unnecessary to consider the question whether the plaintiff has a claim as owner to the centre of Warren Street, or whether he has an easement as an abutting owner thereon.

The remaining questions of the case have been fully examined and decided by the trial judge, and it seems unnecessary to recapitulate.

I think the judgment appealed from should be affirmed.

J. F. DALY and ALLEN, JJ., concurred.

Judgment affirmed.