## DETERMINED IN THE

# FIRST DEPARTMENT,

### AT

## GENERAL TERM,

### 𝕸𝖆𝖗𝖈𝖍,* 1886.

In the Matter of the Petition of the NEW YORK CABLE RAILWAY--COMPANY.

*City railroad — formation of a corporation under chapter 606 of 1875, as amended by chapter 252 of 1884 — motion to confirm the report of the commissioners — upon what grounds the application will be denied upon the merits — the corporate existence of the petitioner may be denied — the commissioners must comply strictly with the requirements of the act as to fixing the time for the construction of the railroad — they cannot grant an extension of time not therein provided for — the act in question is not applicable to companies occupying the surface of the streets — to what companies the exceptions contained in chapter 252 of 1884 apply — power of the legislature to repeal or alter franchises.*

In the latter part of April, 1884, commissioners who had been appointed by the mayor of the city of New York, under the provisions of chapter 606 of 1875, to determine upon the necessity of constructing steam surface railways upon the streets and avenues of the said city and, if found necessary, to fix and determine the route or routes of such railways, concluded their proceedings by providing for the incorporation of the petitioner, which was authorized to construct a steam cable surface railway upon the streets and avenues specified in the commissioners' report upon complying with the terms and conditions therein prescribed. Between that time and the last day of October the petitioner sought to obtain the consent of the owners of the property, upon the streets on which it proposed to construct its railways, to their construction and operation. Having failed to obtain such consent the petitioner applied for, and on December first obtained from the General Term, an order appointing commissioners to determine whether or not the said railways ought to be constructed or operated, who, after hearing the petitioner and persons opposed to the construction of the road, made their report on the last day of July, 1885, in favor of the construction of such railway.

---

* Decisions handed down March 25, 1886.

Upon a motion by the petitioner for an order of the General Term confirming the report of the commissioners:

*Held,* that in view of the fact that a portion of the route extended through several narrow streets, extensively used for commercial purposes; that the construction and operation of the railway in such streets would necessarily render them to a great extent incapable of accommodating the business to which they were devoted, and could not fail to largely depreciate the value of the property without affording any very great accommodation for the transit of the public, that so much of the commissioners' report as was favorable to the construction of railways in these streets would be disapproved.

Material and substantial objections were made to the device by which the cars upon the proposed railway were to be propelled, and to the effect of the structure required, beneath the surface of the street, for the construction and operation of the road, the evidence offered in support of these objections being sufficient to make their existence and materiality decidedly probable.

*Held,* that the matter was left in too much doubt to justify an order of this court, which would devote such a large number of the streets of the city to the construction of railways which at the present time were, to a great extent, experimental.

*Held,* further, that before the petitioner could be permitted to construct or operate a railway upon any of the streets it was indispensably necessary that it should be found to be vested with a legal right so to do, and that any person whose interests might be affected by the proceedings to be taken by it might contest this right by denying the corporate existence of the petitioner.

Section 6 of the said act of 1875 provides that "the said commissioners shall, within the like period of ninety days after their organization, fix and determine the time within which such railway or railways, or portions of the same, shall be constructed and ready for operation."

In this case the commissioners directed that the railways should be constructed and be ready to be operated "within three years from the date of the obtaining the consent of the owners of one-half in value of the property bounded on, and the consent of the local authorities having control of that or those portions of streets or highways upon which it is proposed to construct and operate such railway or railways, or in case consent of such property owners cannot be obtained, from the date of the confirmation by the court of the determination of three commissioners appointed by the General Term of the Supreme Court in the First Judicial District, that such railway or railways ought to be constructed and operated, provided that the date of such confirmation be the same or subsequent to the date of said consent of such local authorities."

*Held,* that as the authority of the commissioners was wholly statutory, all the directions of the act were required to be closely followed and observed by them.

That the provision in question could not be construed as merely directory.

That as the time within which the consent of the property owners, or, if that should not be obtained, the confirmation of the report of commissioners and the consent of the local authorities should be secured, was in no manner mentioned or designated otherwise than that the applicant should proceed with all

due diligence in those proceedings, and as this provision was entirely indefinite and failed to fix any specific period within which such proceedings should be taken and consummated, the commissioners had failed to comply with this requirement of the act.

What the law intended in this respect was that such a direction be given as would enable the company proposed to be incorporated, as well as the public, to understand at what time the railway should be constructed and ready to be put in operation.

That as the act admitted of but one extension of time—that created by section 38, for time unavoidably consumed by the pendency of legal proceedings—the commissioners had erred in attempting to provide for another contingent extension not warranted by the act.

*Held*, further, that the act in question (chap. 606 of 1875) was not intended to authorize the formation of corporations to lay and operate railways upon the surface of any of the streets and avenues of the city, but was limited to railways not using or occupying the surfaces of the said streets or avenues.

That even if this were not so, yet any right such companies might have had to construct such railway upon the surface of the said streets, under the original act, was taken away by the passage of section 16 of chapter 252 of 1884, providing that "no street surface railroad shall be constructed to run, in whole or in part, upon the surface of any street or highway under the authority of any commission appointed under the provisions of said act."

That although the said section was to be construed as prospective in its effect, yet it was to be construed so as to include every street surface railroad proposed to be constructed under the said act, which at the time of its enactment had actually constructed no part of its railway.

That the provisions contained in section 18 of the act of 1884, to the effect that nothing therein contained should "repeal any right of any existing street surface railroad company to construct, extend, operate and maintain its road in accordance with the terms and provisions of its charter," did not apply to the petitioner's case for the reason that at the time when the act of 1884 went into effect, it had not secured the right to construct, extend, operate or maintain a railroad, as it had not then procured the consent of the local authorities or that of the property owners, or the alternative report of the commissioners and its confirmation by the General Term.

That the legislature had power to divest the petitioner of the privilege of going on and acquiring the necessary consents which would enable it to construct the railway, which privilege it possessed at the time of the passage of the act of 1884, under the right reserved by the Constitution of altering or repealing general or special acts for the formation of corporations.

Such corporate franchises or privileges are not within the descriptions of property intended to be protected by section 6 of article 1 of the Constitution.

That the privileges or franchises were not placed beyond the control of the legislature by the fact that the applicant had paid to the commissioners some $57,000 for their *per diem* allowance and for necessary expenses, as required by section 38 of the said act of 1875.

DAVIS, P. J., dissented, being of the opinion that the petitioner was lawfully and constitutionally organized in substantial conformity to the statutes of the State. There has been at no time any difference of views in this court as to its power to withhold its approval of the construction of a railroad upon some of the proposed routes, if it should conclude to grant approval as to others, nor as to its right to refuse to confirm the report because of a failure of the commissioners to provide for any adequate compensation in the present and future, to the people of the city, for the valuable franchise which the public authorities were called upon to cede by a practically perpetual title. (DAVIS, P. J., and BRADY, J.)

MOTION on behalf of the petitioner to confirm the report of commissioners appointed to determine whether the petitioner's proposed railways ought to be constructed or operated, and motions on behalf of owners of property on streets proposed to be used by the company to vacate the order appointing the commissioners.

*William M. Evarts, Everett P. Wheeler, Charles P. Shaw, Robert Sewell,* for the petitioner.

*Aaron J. Vanderpoel, Thomas P. Wickes, Frederick W. Adee, Charles W. Seymour, M. Dwight Collier, Frederic R. Coudert, Clifford A. Hand, Alfred Wagstaff, Grosvenor P. Lowery, Wm. C. Trull, L. F. Cozans, Oliver K. King, John H. Watson, Luther R. Marsh, , James M. Varnum, John M. Scribner, O. E. Bright, James A. Deering, Joseph B. Ecclesine, Wheeler H. Peckham, Waldo Hutchins, Aug. S. Hutchins,* for the city and the property owners.

DANIELS, J.:

These proceedings were commenced in the fall of 1884. Commissioners were previously appointed by the mayor of the city of New York to consider and determine whether surface railways upon the streets and avenues, finally included in their determination, were necessary, and they did, pursuant to what they assumed to be the authority vested in them by the act of 1875, adopt a favorable determination upon that subject. They invited the submission of plans for the construction and operation of the railways decided upon, and without particularly designating them, adopted such plans in the manner that was required to be done by the statute. They also, within the period allotted for that purpose, prepared articles of

association for a company proposing to construct the railways and in such articles attempted to embody the several conditions, requirements and particulars determined upon by them, pursuant to certain sections of the act. Under the articles of association adopted by them, provision was made for the organization of the applicant, as a corporation to be invested under the act, "with authority to construct, maintain, operate and use, in accordance with the plan adopted by said commissioners, a railway or railways upon the route or routes, and to the points decided upon," as that was believed to be intended to be secured by subdivision 5 of section 26 of the act, chapter 606 of 1875. The capital of the corporation was fixed in its amount and was afterwards subscribed, and the requisite percentage paid, and a formal organization took place by the election of officers and directors.

The commissioners appointed by the mayor concluded their proceedings providing for the incorporation of the petitioner and the construction of the railways in the latter part of April, 1884. Between that time and the last day of October, 1884, the petitioner devoted its efforts to obtaining the consent of the owners of the property upon the streets on which it proposed to construct its railways, to the construction and operation of such railways. It failed to obtain that consent, and afterwards applied to this court for the appointment of commissioners to determine whether its proposed railways ought to be constructed and operated. An order was made for the appointment of such commissioners on the 1st of December, 1884, and after hearing the petitioner and the evidence proposed in its behalf, and the persons opposed to the construction and operation of these railways, the commissioners made their report on the last day of July, 1885, favorably to the construction of such railways. The routes adopted by the commissioners appointed by the mayor and accepted by the petitioner were twenty-nine in number, but by the action of the commissioners appointed by this court to determine whether the railways ought to be constructed and operated two of the proposed routes remained unadopted. These were routes 4 and 16. As to those which were adopted by the commissioners and favorably reported upon, very strenuous objections have been urged against their approval, on behalf of the owners of property upon the streets intended to be occupied by the construction of

these different railways. The owners of the property upon that part of route 1, which includes William street, and upon all of route 5, including Liberty street, Maiden lane and Cortlandt street, and the owners of the property along the line of Catharine street, and included in route 26, and of so much of route 1 as includes Wall street, have especially objected to the construction of the petitioner's railway, because of the contracted capacity of such streets, and upon the further fact that a railway in either of them is entirely unnecessary for the accommodation of the public.

The width of William street, between the curbs, has been shown to be not over twenty feet. In that street it is proposed to construct a double track railway. The tracks required to be laid for this purpose, if that should be permitted, including the space between them, and the width of the cars beyond the tracks, would practically render this street entirely useless for any other purpose than the operation of the railway, while the cars were being used upon it. The street is one of the business centers of the city, and the evidence of the owners of the property is to the effect that the construction and operation of this railway there would not only greatly depreciate the value of the property fronting upon the street, but would seriously interrupt and destroy the capacity of the street for the transaction of business. Contiguous railways upon other streets east and west of William street already afford the means of convenient transit to and from this portion of the city, and to add a railway of this description upon this street would very greatly impair its public usefulness and injure the persons owning the property upon it. These consequences would be so great and serious that no possible benefit to be derived by the public from the construction and operation of the railway could form anything like an equivalent for them.

And the like objections as to the capacity of the street are equally applicable to most of that part of Wall street as is included within route No. 1. Both the business and the contracted nature of the street are such as to forbid its devotion to the construction of a portion of this railway. If it were laid and operated it would practically occupy the entire street, and in that manner seriously interrupt the transaction of the business of the street and render it inaccessible in a great degree to persons frequenting the street in

the way of business by the use of other vehicles. The street itself is so nearly approached by other railways as also to present a serious objection to its devotion to the purposes of the petitioner. Persons desiring to reach it can readily do so by way of existing railways, and there is no state of facts presented which either required or would sanction the appropriation of that street to the construction of the petitioner's railway.

Route No. 5 is equally as objectionable as the other two. Liberty and Cortlandt streets and Maiden lane are the avenues over which a large number of vehicles are constantly passing during the business hours of the day. Liberty street varies in width between the curbs from about fourteen to twenty-two and a fraction feet. Cortlandt street, together with Maiden lane, are not to exceed from twenty to fifty-three feet in width, the greater width extending over but a short distance. Upon Liberty street one track is proposed to be constructed to be continued through Maiden lane, and then to be returned by another track to Cortlandt street, proceeding upon that street to West street. The construction and operation of this railway in these streets would necessarily render them, to a great extent, incapable of accommodating the business necessities to which they are now devoted. It could not fail to largely depreciate the value of the property, without affording any very great accommodation for the transit of the public.

The route proposed by the way of Catharine street has also been shown not to be required to accommodate any large amount of passage between the points from which it is designed to construct and terminate it. It is generally opposed by the owners of the property fronting upon the street, and does not appear to be adapted to promote in any substantial degree the convenience of that part of the public having occasion to make use of this proposed route. As to the narrow streets generally a difference of opinion appeared to exist in the minds of the commissioners appointed by the mayor to consider and lay out the different routes for the railways. When the subject came up for final consideration and determination and it was put to a vote, the president of the board of commissioners and another of its members were the only individuals who voted unqualifiedly for the adoption of these twenty-nine different routes. The other three commissioners did not approve of the scheme as a

whole. Their views were expressed by Mr. Commisssioner Randolph. In the course of their expressions he made this statement: "I find myself in this position since I have accepted the office of commissioner. I am confronted with the opinion of the counsel to the board, and the additional opinions of special counsels who have been retained, that the time has expired within which any routes can be located, abandoned or changed, and that, furthermore, there is no power to withhold from the company to be formed authority to construct a railway on any route heretofore fixed and determined by you. At the same time it appears that even were a company authorized to construct all these routes, the law required the consent of the property owners or the approval of the Supreme Court, and also the consent of the common council, before *any* of the located routes can be actually built. Ample opportunity must thus be given for a reconsideration of any of the routes, or of any of the questions involved, before anything definite can be done. In view of these facts I must either become an obstruction in the path of the much needed relief to city travel, and vote to set at naught all the work of the commission, or else must vote in favor of the articles of association, trusting to the citizens and the courts and the city government to exercise their powers, with which under the act they are severally clothed, to limit any company, that may be formed, within the bounds of propriety and public need. I have felt bound to state my position on these questions, and with this explanation I shall vote for the articles of association, so that a company may at least be incorporated and that books may be opened for subscription within the time required by law, now so nearly expired. I vote aye." And it was, with the qualifications contained in it, that he himself and Commissioners De Veau and Hedden voted for the adoption of the plan. Their judgment was evidently against the construction of portions of the petitioner's railways. But they voted for the adoption of the plan upon the understanding that no time then remained for the reconsideration or reconstruction of any portion of it, and with the expectation and design that its correction should be remitted to the action of the court and the municipal authorities of the city. So far as the routes have been mentioned entire correctness must be accorded to the views expressed by Mr. Randolph. The construction of the rail-

ways would be very improper in the streets which have been mentioned, and to that extent, for these reasons, so much of the report of the commissioners as is favorable to the construction and operation of railways in these streets should be disapproved by this court.

The commissioners were appointed by the court without notice to or a hearing of the owners of the property or others whose interests might be injuriously affected by the construction of the railways. The order for that object was made very much as a matter of course. But upon objection being afterwards taken on behalf of certain property owners, to the sufficiency of the affidavits, upon which it was alleged that the consent of the property owners fronting upon the different streets could not be obtained, they were found to be very materially defective, and an order was made on behalf of the applicants opposed to the construction of the railway on a portion of route 15, relieving that from the proposed route of the applicant. After that had taken place, further affidavits for the correction of these defects were allowed, upon notice, to be filed by the petitioner, but without then determining whether the court could legally permit that to be done. The objections to that course were allowed to remain, as the evidence had then been chiefly taken before the commissioners, until they should make their report, and a final hearing for its confirmation should take place. But it is not necessary, in view of the convictions now adopted concerning the petitioner's railways, to consider the point whether these affidavits should or should not have been permitted to be filed, for the obvious purpose of presenting a case which should have been made out in favor of the petitioner, before the order was taken for the appointment of the commissioners, whose report is now before the court for consideration.

As to all the routes very material as well as substantial objections have been made, in addition to those arising upon the act itself, under whose provisions the petitioner has proceeded, and also as that has since been affected by chapter 252 of the Laws of 1884. These particular objections relate to the device itself, by which the cars upon the railways are to be propelled, and the effect of the structure required, beneath the surface of the streets, for the construction and operation of the road. It has been shown by affida-

vits that the sewers and the gas-pipes may be deranged in this manner, and that the water mains will, in the severe weather of winter, be exposed to the danger of freezing. In the permanent construction of the road, a trench for the use and management of the cable, with the apparatus required for that purpose, of at least two and a half feet in depth, will be a permanent necessity. That trench will extend through the center of each track of the proposed railways. It will be opened at its center by a slot through which the cable is to be lifted and used by attaching it to the cars. And in consequence of maintaining this slot in an open condition, it is apprehended that the trenches will become the receptacles of stagnant water and filth, always accumulating to a greater or less degree upon the streets, and that in the severe weather of the winter this may be so far affected by the cold as to injuriously affect the water-pipes. If these fears shall be realized, as there is a probability certainly that they may, then the trenches may become a source of injurious vapors to the health of the people living upon the streets, and the frozen water-pipes themselves could not fail to prove an unmitigated disaster to all the inhabitants of the portions of the city which might in that manner be affected.

It has been urged, by way of answer to these objections, that similar cable railways have been laid and operated upon streets in the city of Chicago, which have not resulted in producing either of these apprehended difficulties. But in reply to that, it has been shown that the water-pipes and sewers in that city are at a much greater depth below the surface of the street than they are in the city of New York, and for that reason not so liable to be affected by a permanent opening below the surface of the streets. Evidence was also given before the commissioners showing that the existence of the slots in the center of the railways, presented a serious obstacle to the use of horses in the streets, for the reason that, in crossing, the calks of their shoes were liable to be caught in the slot and wrenched off or the legs of the horses seriously strained and injured. And not an unfrequent occurrence, also, is that of the breaking of the cable, by which all the cars attached to it upon the entire route of the road, so far as it is operated by one continuous cable, are brought to a standstill and incapable of being moved by means of the machinery of the company until the breakage of the cable shall

be repaired by uniting the broken ends. Further evidence was given tending to sustain the conclusion that cars, propelled by means of the cable, cannot be arrested in their progress so readily as those propelled by horse power, and in that manner become the cause of injury, including serious as well as fatal disasters to persons otherwise making use of the streets. Evidence has also been given tending to show that the rate of speed attainable in the use of the cable by cars running upon a railway constructed upon the surface of the street, is not so great as to be adapted to the wants of long routes ; that under ordinary circumstances the speed will, with reasonable precautions observed to avoid accidents, but slightly exceed that of six miles an hour. These facts have been so presented as to leave but little ground for doubt, in view of all the evidence bearing upon them, concerning their existence. The probabilities are decidedly in their favor, and if they are to be accepted by the court, very little advantage can be expected by the public from this particular description of surface railway. Upon these subjects very reliable evidence was taken by the commissioners, and even if it should not be determined at this time that the facts referred to have all been fully established, it still leaves the matter in too much doubt to justify an order of this court, which would devote this large number of the streets of the city to the construction of railways which, at the present time are, to say the least, to a great extent experimental. It may be that in the progress of improvements which shall hereafter be made, some of these objections will be deprived of their force and effect. But the public certainly should not be obliged to take the risk of these chances, and in the meantime be required to submit to the devotion of so many of the streets of the city to this object. Increased facilities for travel through the city are undoubtedly required, but when they are adopted or permitted they should be of that description which will surely afford to the public the conveniences which have become essential to their movements, as well as prove reasonably healthful and safe. This invention has not yet attained that state of certainty which will render it probable that these objects can be secured by means of its adoption and use.

If but one line was proposed to be made, passing between no very distant points of the city, these objections would be less cogent

in their character than they are to the present scheme, which proposes to appropriate several of the north and south, as well as many of the easterly and westerly, streets of the city. There is too much of the plan to justify an order in any view that can be taken passing these streets over to the control and use of the petitioner, for the purpose of railways of this description, even if the law itself, upon a proper construction of its language and provisions, would permit that to be done. And it has been so combined and interwoven as not to render it capable of judicious division as it is now presented.

Before the petitioner can be permitted to construct or operate a railway upon either of the streets of the city, it is also indispensably necessary that it shall be found to be vested with the legal right, under the laws of the State to do that. And its existence, as a corporation under the act of 1875, may be challenged and denied by the persons whose interest may be affected by the proceedings designed to be taken by it. This rule has been applied to proceedings taken to obtain the lands of private owners, for the construction and use of railways. (*Matter of Brooklyn, etc., R. R. Co.*, 72 N. Y., 245 ; *Matter of N. Y., Lackawanna, etc., R. R. Co.*, 35 Hun, 220 ; affirmed, 99 N. Y., 12.) And it is for the reasons assigned to support it, as applicable to the present investigation. All the proceedings, both of the commissioners appointed by the mayor and of those appointed by this court, have been taken under the authority of chapter 606 of the Laws of 1875, and the acts amendatory thereof. By the proceedings of the commissioners appointed by the mayor, the railways laid out are, with slight exceptions, designed to be constructed and operated upon the surfaces of the several streets, and the objection has been strenuously urged that this act was not designed and has not been so framed as to provide for the construction of steam street surface railways. The railways mentioned in it have been described as " steam railways," and the point has been taken that this phraseology was intended to include only such railways as are popularly known and understood to be steam railways, as distinguished from cable railways, upon which the cars are not designed to be directly operated by the force or application of steam, but indirectly and through the intervention of a continuous cable. But this point is deprived of its force by subdivision 4 of section 26 of

the act, which allows the use of any motor other than animal power by corporations created under its authority. The act further provided by section 4 that the location and construction of the railways should be "over, under, through or across the streets, avenues, places," etc., and the point has been urged, on the consideration of the court, that a railway constructed upon and along the surface of a street or avenue is not such a railway as is within the meaning or understanding of these terms, or, in other words, that a surface railway cannot be a railway constructed over, under or through a street. There is certainly force in this objection; and the act itself, in this and other sections, contains further provisions indicating that a surface railway was not understood to be included by the legislature within the signification of these terms.

The laws have generally designated and provided for a railway upon the surface of a street by different language, and section 40 of this act discloses the existence of such an understanding, for it has been there provided that " none of the provisions of this act shall apply to any railroad company organized under any general or special law of this State for the purpose of constructing or operating a steam railroad *upon* the surface of the ground, nor to the operation or management of any such railroad heretofore constructed."

The railways, the construction of which was designed to be sanctioned by the act of 1875, are also referred to in section 5 as including "necessary supports, turnouts, switches, sidings, connections, landing places, stations, buildings, platforms, stairways, elevators," etc.; and by section 17 necessary "stations, depots, engine-houses, car-houses and machine shops;" and by subdivision 5 of section 26, the company to be organized under the act has been empowered "to construct, maintain, operate and use, in accordance with the plan adopted by said commissioners, a railway or railways upon the route or routes and to the points decided upon and to secure the necessary foundations and erect the columns, piers and other structures which may be required to secure safety and stability in the construction and maintenance of the railways constructed upon the plan adopted by the said commissioners, and for operating the same ;  *  *  *  and in all cases the surface of said streets around such foundations, piers and columns shall be restored to the condition in which they were before such excavations were made,

as near as may be;" and in the management of its railway the company have also been directed, by section 30 of the act, to "run their cars for the transportation of passengers and property at regular times, to be fixed by public notice," and to have the usual stopping places; and by section 29 power has been given, if any passenger shall refuse to pay his fare to the conductor of the train or the servants of the corporations "to put him and his baggage out of the cars, using no unnecessary force, at any usual stopping place or near any dwelling-house, as the conductor shall elect on stopping the train."

The provisions are most, if not all of them, more especially adapted to the construction and operation of a railway above or under the surface of the street, than to a railway designed to pass along its surface, and indicate the intention of the legislature to have been, that a railway passing over, under or through the streets and avenues of the city would not be a railway constructed over and along the surface of the street itself. The provisions of the act have not been adapted to such a railway and were understood, at the time of its enactment and afterwards, to have been intended to be limited to railways not using or occupying the surface of the streets or avenues of the city themselves. And for that reason section 4 of chapter 606 of the Laws of 1875, as it was first enacted, and as it has since been amended by chapters 417 of the Laws of 1880 and 485 of the Laws of 1881, has excepted from the streets and avenues over, under or through which steam railways may be authorized, "such portion of streets and avenues as are already legally authorized for or occupied by an elevated or underground railway." And that exception would not have been apposite or appropriate, if the commissioners had the power to lay out the routes of steam railways on the surfaces of the streets, for the latter by no possibility could interfere with the former. But if the authority intended to be given over the streets was designed to be confined to elevated and underground railways, then there was eminent propriety in withholding the power to sanction another elevated or underground railway, where a preceding railway of the same description had been already permitted to occupy the same street or streets in the same manner. The construction is, therefore, not without reason that in the streets and avenues

of the city, the act of 1875 was not intended to authorize surface street railways, which are to be operated by steam. And this was so expressed, although the point was not presented for decision. *In the Matter of the New York Elevated Railroad Company* (70 N. Y., 327), where it was said, in the course of the opinion, that "the object of the act was to provide for the construction of elevated and underground railways," and that it "embodies a general scheme for the construction of elevated and underground steam railways." (Id., 343, 352.) And this idea was again expressed *In the Matter of Gilbert Elevated Railway Company* (70 N. Y., 361, 366), where it was said that "the rapid transit act authorizes a comprehensive and independent system of rapid transit by elevated railroads through the city." This understanding and construction of the act would not, in any view, permit the petitioner to lay and operate a surface railway of this description, under its authority, upon and along any of the streets and avenues of the city.

There are also further objections taken to the proceedings themselves in their failure to comply with or conform to indispensable requirements contained in the act of 1875, for they literally failed to comply with that part of section 6 of the act of 1875, which declared that "the said commissioners, within the like period of ninety days after their organization, shall fix and determine the time within which "such railway or railways, or portions of the same, shall be constructed and ready for operation." What they did to meet this requirement of the statute has been stated by them in a certificate which they made directing that the railways shall be constructed and be ready to be operated "within three years from the date of the obtaining the consent of the owners of one-half in value of the property bounded on, and the consent of the local authorities having control of, that or those portions of streets or highways upon which it is proposed to construct and operate such railway or railways, or in case consent of such property owners cannot be obtained, from the date of the confirmation by the court of the determination of three commissioners appointed by the General Term of the Supreme Court in the First Judicial District, that such railway or railways ought to be constructed and operated, provided that the date of such confirmation be the same or subsequent to the date of said consent of such local authorities."

The point, therefore, here arises whether they did by this determ ination fix and determine the time within which the railways should be constructed, as they were directed to do that by section 6 of the act. What they did was to declare and designate the time within which the railways should be constructed after the date of obtaining the consent of the owners, or, if that could not be obtained, the confirmation of the report of commissioners and the consent of the local authorities, while the act without that qualification directed that they should fix and determine the time within which the rail way should be constructed and ready for operation. This direction contained in the act was made in plain language, allowing no technical or artificial construction to be placed upon it, but intended to have effect according to the popular sense of the terms which were employed. Those terms were that the commissioners should "fix and determine" the time, and they were employed in such a manner as to include the period intervening between the time of the determination taking effect and the time when the road should be ready for operation. The entire intervening period of time was in this manner required to be measured and designated by the commissioners. In no other way could the direction to fix and determine the time be complied with. The language both contemplated and required, according to its ordinary signification, that a definite time should be adopted and declared within which the company should construct the railway and have it ready for operation. That they failed to do. For the only period in terms designated by them was that which should intervene between the date of obtaining the consent of the owners of the property, or the time of the confirmation of the report of commissioners, if that consent could not be obtained, and the consent of the local authorities and the completion of the railway. The time within which the consent of the property owners, or, if that should not be obtained, the confirmation of the report of commissioners and the consent of the local authorities should be secured, was in no manner mentioned or designated, otherwise than that the applicant should proceed with all due diligence in those proceedings. This injunction was entirely indefinite and failed to fix any specific period within which such proceedings should be taken and consummated. It admitted of a degree of elasticity which might indefinitely postpone the construction of the railway by the

applicant. What might or might not be due diligence would depend upon facts liable to be more or less the subject of controversy, and, therefore, incapable of any definite bounds or limitation. Whatever the intervening delay might be it would be capable of being excused under the undefined latitude of this direction, and the necessity and convenience of the public would, in that manner, be subordinated to the result of conflicting views as to what diligence might or might not require to be done. That was not what the legislature intended in providing for improvements of this character. The language used does not appear to admit of any indefinite degree of construction. If it could be satisfied in this manner, it could be by leaving the entire subject-matter as to time to depend upon the observance of what might be considered due diligence on the part of the company. If the commissioners could render any portion of the proceedings required to be taken dependent upon the direction to observe, due diligence, there seems to be no reason why the same criterion might not be adopted to measure the entire intervening period. of time when the work of the company should be required to be consummated. If it could be permitted at all, it could be for the whole time referred to in the statute, and then this direction to fix and determine the time could be wholly dispensed with. But that clearly would defeat the purpose of the legislature in giving this direction. That the language was not inconsiderately used or employed, without precision of meaning, is further evident from the amendments of the same section made applicable to other parts of the State by chapter 393 of the Laws of 1882, where the duty of prescribing the time is again enjoined in the same form upon the commissioners. What the law intended in this respect was that such a direction should be given as would enable the company proposed to be incorporated, as well as the public, to understand at what time the railway should be constructed and ready to be put in operation. And the only exception created by which the time is allowed to be enlarged or extended. is that mentioned in section 38 of the act of 1875, directing that " the time, if any, unavoidably consumed by the pendency of legal proceedings shall not be deemed a part of any period or time limited in this act."

It has been urged in support of the proceedings of the commissioners that this provision of these statutes might be construed to

be directory. But the rule which has been followed by the courts when the time mentioned in a statute has been held to be directory, is not applicable to these proceedings. It has been applied more especially to the time within which public officers may be required to exercise official authority, or an act may be directed to be performed for the benefit of the public, and when no limitation forbidding the extension of the time has in any manner been intimated by the legislature. That was considered to be the effect of so much of the act of 1875 as required the performance by the commissioners of a certain designated act within the period of sixty days. (*Matter of N. Y. Elevated R. R. Co.*, 7 Hun, 239.) In this legislation the language employed descriptive of the duties of the commissioners, related to what was to be performed by the corporation to be created and required a definite limit to be declared in which the work should be done. And that this limit should be clearly declared and defined, and should not be transcended, except in the single event already mentioned, is practically declared to be the intention of the legislature by other provisions contained in the act. For by section 7 of the act the articles of association to be prepared by the commissioners were required to " provide for the release and forfeiture to the supervisors of the county of all rights and franchises acquired by such corporation in case such railway or railways shall not be completed within the time and upon the conditions therein provided." What this was intended to contemplate was plainly a definite period, at the end of which the rights and franchises of the company should be forfeited in case it failed to construct and have its railway ready for operation.

The commissioners also failed to observe what had been required, by further providing for another contingent extension of time not warranted in any form by any provision of the act. That, as already mentioned, was made to permit of but one extension, and that was for time unavoidably consumed by the pendency of legal proceedings. By creating this indulgence an implication arose that it was to be exclusively confined to the effect of that event, and that no other intervening circumstance should be allowed to extend the period to be fixed and determined by the commissioners, for by a familiar rule of construction the creation of this proviso is required to be construed as exclusive of others not referred to. (*Matter of Methodist Church,*

*etc.*, 66 N. Y., 395.) By the determination of the commissioners, however, they provided for further extension of time because of the omission of the public authorities "to open or grade, or delay in opening and grading, any street or avenue, or any part or parts thereof." Whenever such an omission might be encountered the time for the construction of the railway was permitted by the commissioners to be postponed or deferred during its continuance, even if that should extend through any number of years, and they thereby added events upon which further delays might be claimed, not within the authority given to them by the statute. But if they had fixed and determined the time, as the act required that to be done, the effect of this particular direction might be avoided, for adding an unauthorized direction, as this clearly was, would not invalidate or affect an entirely legal determination previously made.

This was wholly a statutory authority required to be closely followed and observed by the commissioners. They failed to comply with the directions given for the determination which, as to time, they were directed to make. This failure was material and important, and prevented what they did from being entitled to be sustained, as a performance or observance of the authority confided to them. And it was so held by the Court of Common Pleas when the rights of this cable company were before that court.

A further obstacle has been presented in the way of the applicant to construct and operate a surface railway by section 16 of chapter 252 of the Laws of 1884. This section was enacted and became a law in a few days after the petitioner's organization had been completed by the commissioners, and it was in part designed to modify and limit the effect of chapter 606 of the Laws of 1875, and the acts amending the same, for it provided that "no street surface railroad shall be constructed to run in whole or in part upon the surface of any street or highway under the authority of any commission appointed under the provisions of chapter six hundred and six of the Laws of eighteen hundred and seventy-five, entitled 'An act further to provide for the construction and operation of a steam railway or railways in counties of the State,' or the acts in addition thereto or amendatory thereof." This section is undoubtedly to be construed as prospective in its effect, but as so construed it would be applicable to cases where, at the time of its enactment, no railway

had been in whole or in part constructed under the authority of the act of 1875. Such is its language, and by no rule of construction can it be otherwise understood. It is very general and made so broad as to include all street surface railroads proposed to be constructed under the authority of the act of 1875, and it was no farther restrained than by section 18 of the same act, declaring that nothing in it should interfere with " or repeal any right of any existing street surface railroad company to construct, extend, operate and maintain its road in accordance with the terms and provisions of its charter."

The precise limitation imposed by this provision upon the preceding sixteenth section is that by means of it the latter was prohibited from divesting any right of an existing surface railroad to construct, extend, operate and maintain a railway. But the applicant had not, at the time when this act of 1884 was enacted, secured the right to construct, extend, operate or maintain a railroad. It had simply obtained the certificate or charter made by the commissioners acting under the authority of the law of 1875, and had in form organized as a corporation under that authority. Its right to construct a railway upon the routes in controversy still depended upon its ability to secure the consent of the local authorities, and the consent of a majority in value of the owners of property fronting upon the streets and avenues, or by reason of the failure to obtain this latter consent, the favorable report of commissioners to be appointed by the Supreme Court, and the confirmation of that report. The Constitution, by article 3, section 18, had prohibited the construction of a street railway without the previous assent of the local authorities and the consent of the owners of one-half in value of the property bounded on the street; or in case the latter consent could not be obtained, then the consent of commissioners appointed by the General Term, whose favorable determination should be confirmed by the court. And the same restrictions are embodied in the act of 1875. To acquire the right to construct, extend, operate or maintain a railway, a compliance with these provisions was made an indispensable prerequisite. Until that should be done no right to construct a railway could exist.

The applicant had acquired neither of these consents, and no proceedings to obtain the appointment of commissioners from the

court were taken until after the act of 1884 went into effect.   The only right secured to it by the certificate made under the act of 1875 and its formal organization was the right to proceed and obtain these consents.   That was as far as its authority had been extended under the Constitution and the statute.   It had been invested with simply a privilege or legal authority to proceed, if it should be able to do so, and in that manner acquire the right to construct a railway by complying with these provisions of the Constitution and the statute.   Until they should be complied with the right of the applicant to construct, extend or maintain a railway, could not exist.   This provision of the act of 1884 requires to be construed, as statutes usually are, according to the fair import of the language employed in enacting it, and it is to be assumed, therefore, that when the legislature reserved only this right of an existing street surface railroad it intended to exempt from the preceding section of the act cases alone in which the right itself had matured in favor of a company incorporated under the act of 1875 to proceed and construct its road, and that it was not intended to include a case where no such right had been obtained, but the utmost extent of the right was that of endeavoring to obtain the consents already mentioned.   Upon the subject of the construction of statutes framed as this was it has been held that " where the language is definite and has a precise meaning it must be presumed to declare the intent of the legislature, and it is not allowable to go elsewhere in search of conjecture to restrict or extend the meaning." (*Johnson* v. *Hudson River R. R. Co.*, 49 N. Y., 455, 464.)   And " all statutes must have a construction according to the language employed, and where no ambiguity exists courts cannot correct supposed defects."   (*Benton* v. *Wickwire*, 54 id., 226, 228.)   And " the words of the statute must be construed in their plain obvious sense, according to their signification, among the people to whom they were directed."   (*Matter of O'Neil*, 91 N. Y., 516, 520.)

These authorities sustain the conclusion already expressed, that when the legislature used the words " right to construct a railway," they intended by them to include only the class of cases in which the right itself had been brought into existence, and not cases where other indispensable and future proceedings were required to be first taken before the right could have any possible existence.

The latter was the condition in which the applicant in the most favorable view can be held to be in, and consequently that the mere privilege in terms secured to it by what had taken place, was not within the protection of this clause of the statute.

The limitation or restriction of the act of 1875, in this manner, was in substance provided for by its thirty-fourth section, declaring that the legislature might at any time annul or dissolve any corporation formed under that act. More enlarged authority was also given to the legislature over it by section 1 of article 8 of the Constitution, which declared that "corporations may be formed under general laws, but shall not be created by special act except for municipal purposes," etc. And "all general laws and special acts passed pursuant to this section, may be altered from time to time or repealed." It cannot be successfully objected that the act of 1884 could not divest the applicant of the privilege of going on and acquiring the necessary consents which it has been provided should be first obtained, to authorize the construction of a street railway. For while it is true that the legislature cannot deprive a corporation of any of its property, it may limit, restrict or withdraw any of its franchises or corporate privileges by means of the power reserved to it by the Constitution. For such franchises or privileges are not the descriptions of property intended to be protected by anything contained in section 6 of article 1 of the Constitution. They are conferred by the concessions of the laws and derived wholly from their provisions, and an organization under their authority, and to them the provision of the Constitution is applicable, allowing them from time to time to be altered or repealed. The distinction which has been taken on this subject warrants the conclusion that it is only where other rights of a proprietary character have been acquired and become vested, that the interposition of the legislative authority for divesting or forfeiting them has been forbidden. (*Com.* v. *Essex Co.*, 13 Gray, 239, 253; *Parker* v. *Metropolitan R. R. Co.*, 109 Mass., 506, 508; *Metropolitan R. R. Co.* v. *Highland Street R. R. Co.*, 118 id., 290, 293; *Thornton* v. *Marginal Freight Ry. Co.*, 123 id., 32.) The rule does not apply to a mere franchise or privilege, which is all that had been acquired in the most favorable view by the applicant when the act of 1884 took effect. All corporate

franchises are subject to the control of the legislature and may be divested by its authority under the power reserved for that purpose by the Constitution of the State. (*Peik* v. *Chicago and N. W. Railway Co.*, 94 U. S., 164, 176; *Fort Plain Bridge Co.* v. *Smith*, 30 N. Y., 44, 62.) The case in this respect is entirely dissimilar to the *Protestant Episcopal School Case* (58 Barb., 161), which proceeded upon the view that a complete right to the contract in controversy had been vested in the person making the most favorable bid for it. But even that was afterwards reversed by the Court of Appeals. (46 N. Y., 178.)

Nor were the privileges or franchises, in form secured, placed beyond the control of the legislature by the circumstance that the applicant had paid to the commissioners the sum or the greater part of the sum of $57,413.78. For this was not paid for any property within the protection of the other provision of the Constitution already mentioned. It was paid as that has been required to be done by section 38 of the act of 1875, for the *per diem* allowance of the commissioners for their services and for necessary expenses. There were twenty-nine of these routes considered and determined by the commissioners, and it was for their fees and the expenses in the proceedings taken for that purpose that this amount was paid. And that was required to be paid by this section of the act out of the money paid by the subscribers for the stock of the corporation. It was for the expenses of the proceedings through which the franchises or privileges were expected to be secured, and they, notwithstanding the fact of such payment, were still under the Constitution, subject to the control of the legislature. And as the payment was made to defray the necessary expenses and fees of the commissioners in providing for the route of the railway and the certificate of incorporation, the payment was simply for a franchise or privilege remaining subject to and under the control of the legislative authority.

Upon the whole case, as it has been presented and considered, the petitioner should not be permitted by any order of this court to construct and operate a cable railway in either of the streets or avenues of the city. If the system is practicable and desirable, it must now be carried into effect under the authority of chapter 252 of the Laws of 1884. Even if the act of 1875 could be so

broadly construed as to permit the construction of a steam surface street railway by authority of its provisions, that authority has been taken away by this act of 1884. The only exception to its operation and effect was that already considered, of the right of an existing street surface railroad company to construct, extend, operate and maintain its road. The petitioner had acquired no such right at the time when the act of 1884 was enacted. The only right secured by it was that which came into existence by the completion of the proceedings of the mayor's commission, which did not precede the 21st of April, 1884. While the petitioner had not advanced beyond this position, and on the 6th of May, 1884, chapter 252 of the Laws of 1884 went into effect. At that time the petitioner had no right to construct, operate or maintain a surface railroad. It could only secure that right by obtaining the consent of the owners of a majority of the property upon the streets intended to be used by it, and the consent of the municipal authorities of the city, or, in case of the failure to obtain the consent of the owners, the approval of commissioners appointed by this court and the confirmation of their report. These steps were indispensably necessary to bring the right into existence to construct and operate a railroad by the petitioner. Before either of them was taken the act of 1884 intervened and abrogated its right to proceed. To this time it has not acquired the consent of the municipal authorities nor of the property owners, nor the approval of this court, which is provided as a substitute for the latter consent. It, therefore, is not, and cannot be, placed in any legal attitude in which it can secure the right to construct or operate either of these roads.

The application which has been made for the confirmation of the report of the commissioners should be denied, and as that denial will completely dispose of the case, the applications made to vacate the order appointing the commissioners may also in form be denied.

BRADY, J., concurred in the result.

BRADY, J. :

This court has not at any time since the argument of this matter entertained for a moment any doubt of its duty, to insist as indispensable that adequate compensation should be made by the cable

company to the city, for its franchise, to be secured by the resolution of the common council, expressive of its consent and the terms imposed, and this, whether granted in whole or in part, or that the report of the commissioners, as an entirety, should not be adopted. It was enough, therefore, to justify us in withholding our approval that there was no such resolution before us. The recent act of the legislature, by which such franchises are to be sold at public auction, relieves the proceeding of that impediment, and secures by positive enactment the revenues to be derived from the sale of them. There were other questions involved, however, of grave import, which are elaborately discussed by Justice DANIELS, particularly the provisions of the act of 1875, as to the right under them to build surface roads, and the effect upon these provisions of the act of 1884. These questions, after the receipt of his opinion, were thoroughly examined by me, and as I could not agree with him in all of his conclusions I concurred in the result, the opinion thus stated being explained and enlarged by discussions of the subject with my brethren. The opinion of the presiding justice now given, expressing his dissent from the conclusions of Justice DANIELS, renders it necessary, in order that a review, if desired, may be had, that I should definitely state on what I base my concurrence, and it is that, after a more extended examination of the subject, I have found it impossible to resist the conviction that the exposition made by Justice DANIELS of the operation and effect of the statute of 1884 is entirely correct, and, therefore, I place my concurrence solely upon that proposition. I do not differ from the presiding justice in his views as to the probable advantage, in some localities, of the use of the cable method. Indeed, it is not improbable that myself and brethren could agree upon some of the routes or parts of routes designated, assuming that we have the power to do so, which in our judgment would be suitable for it, presupposing the consent of the common council, and with due reference to the provisions of law to secure to the city the revenue to be derived. I think thus for the reason that Justice DANIELS, as indicated by his opinion, would not object to the adoption of some one of the routes for the use of the cable system, if there were no legal objections to prevent such a determination.

I have thus briefly expressed myself rather than further delay

the decision of this matter for a more elaborate discussion, which might be indulged in with propriety, perhaps, in consequence of the dissenting opinion of Presiding Justice DAVIS.

DAVIS, P. J. (dissenting):

The conclusion finally reached by a majority of the court upon a legal and constitutional question raised upon the argument is fatal to the motion of the petitioner, because its necessary consequence is that the New York Cable Railway Company has no lawful existence, and is legally unable to take anything by a confirmation either wholly or in part of the report of the commissioners.

In this conclusion of my brethren I am not able to agree. In my opinion the petitioner is lawfully and constitutionally organized in substantial conformity to the statutes of the State, but I do not propose to enter upon any elaborate consideration of the question, as it will doubtless speedily receive the consideration of the Court of Appeals. There has been at no time any difference of views in the court as to its power to withhold its approval of the construction of the railroad upon some of the proposed routes, if it should conclude to grant approval as to others. That is, that the court was not bound to confirm or reject the whole, but might exercise its judgment upon the report of the commissioners by confirming a part and rejecting the residue. As to several of the streets covered by the routes of the petitioner's railroad, the court were of opinion upon the argument that the consent ought not to be given. Those would easily have been eliminated if a favorable result had been reached as to the others, or any of them. It is not necessary now to particularize them since the conclusion of the court necessarily withholds its consent as to all. For my own part, I do not hesitate to say that I have regarded the application of the proposed cable railway system to some of the routes recommended by the commissioners, and particularly in the upper and newer portions of the city and on various cross-town streets as a most desirable and valuable improvement, second only, in my judgment, to that of the elevated railroads which have survived a storm of obloquy and assault to vindicate their usefulness by subsequent results. In my judgment the time is rapidly coming when the horse railroads of the city must give way to a motor power, either electric or of

steam operating through cables, to the great advantage of the health, the quiet and cleanliness of the city as well as to the rapidity and comfort of the transit and traffic of its citizens. But to me the serious and fatal objection, unless removed, to the confirmation of the report existed in the failure of the commissioners to provide for any adequate compensation in the present and future, to the people of the city for the valuable franchises which the public authorities were called upon to cede by a practically perpetual title to the petitioner. The value of such a franchise is exceedingly great, though difficult to accurately estimate. It would commence its operation in a city of a million and a half of people, but the child is doubtless born that will see it and its environs a city of 5,000,000. The carriage traffic of persons in a city thus rapidly growing cannot be otherwise than immensely valuable and productive, and official sagacity must be equal to the adjustment of a scale of benefit which the public ought to be entitled to receive as in progress of time the franchise develops the true magnitude of its value. I have, therefore, deemed it the duty of the court to delay action on the application of the petitioner till it should appear by the action of the proper public authorities what provision was to be made for securing to the people of the city their fair share for all time in the value of the use of the great franchise, to which a portion of their streets were to be subjected practically forever. The power to make disposition of this momentous question is vested doubtless in the city authorities. The courts, I think, have no power to make such contracts or conditions. The power rests primarily with the board of aldermen. But the court has power, in finally determining whether its approval shall be given to the construction of a street railroad notwithstanding the people along the route do not consent thereto, to inquire whether the interests of such people and of the whole people of the city have been properly conserved in respect to their present and future compensation as part of the body politic in and for the value of the franchise. It was on this ground chiefly that I dissented from the approval of the report in the Broadway Railway case. The action was, therefore, properly delayed until it should be definitely known what steps the public authorities would take to protect the interests of the people in the franchise to be granted.

The first action of the board of aldermen resulted in the defeat of the resolution of consent. This operated for the time being as a total defeat of the whole proceeding. There was no propriety for further action of the court as the matter then stood, because the giving of its approval to the consent of the commissioners in that condition of things could not reinstate a proceeding which the adverse vote of the aldermen of the board had defeated. No action could be taken at that stage by the court that would enable it to ensure proper provisions touching the value of the franchise. The case was, therefore, properly regarded as suspended until some future action, if any, should be taken by the public authorities. That action has occurred and a resolution giving consent to the construction of the railroad has been passed by a strong affirmative vote. That resolution, in our judgment, contained no adequate protection of the people as respects the question of compensation for the use of the franchise. What was provided for was altogether too meagre a sum to be considered as such compensation through the long period the use of the franchise would have had to run. If it had received the sanction of the mayor, therefore, we should unhesitatingly have denied the motion for confirmation as to all the routes for the reason of its failure to secure such compensation. But the resolution has, we think, most properly encountered the veto of the mayor, and the whole subject is again remanded to the board. Meanwhile the legislature of the State has intervened by the passage of the act, entitled "An act to secure adequate compensation for the right to construct, maintain, use, operate or extend street railways in cities or villages." New powers and new duties are now imposed upon the board of aldermen, the proper exercise of which would probably result in securing adequate compensation for whatever franchises the petitioner might secure by competitive purchase under the act. This would suggest the wisdom of further withholding our final disposition but for the legal conclusion to which the court has finally arrived. That conclusion is, however, equally fatal to the conferring of any franchise by our consent even though the consent of the board of aldermen might first be acquired under the new law and with ample security for compensation to the city.

The motion of the petitioner must, therefore, be denied.

Motion to confirm report of commissioners denied.