In the Matter of the Application of THE EAST RIVER BRIDGE
COMPANY.

*Rapid Transit Act — report of commissioners, when final — review by the Supreme
Court — conditions imposed by the court — when confirmation should be refused —
evidence — issue of the stock of a corporation at less than par.*

75  119
143a 249
75  119
5ap142

Under the provisions of the Rapid Transit Act, chapter 4 of the Laws of 1891,
as amended by chapter 102 of the Laws of 1892, a report of commissioners,
appointed thereunder, against the construction of an elevated railway is final.

The responsibility in respect to the construction of an elevated railway, under
the provisions of chapter 4 of the Laws of 1891, rests with the Supreme Court,
which is to determine, where the property holders have refused their assents,
upon all the facts before the commissioners, and those of which it may take
judicial notice, whether it should authorize the construction of the railroad
notwithstanding the objection of the persons who would be injuriously
affected thereby.

The Supreme Court, if it gives its consent to the construction of such an elevated
railway, cannot impose conditions in regard to the enterprise.

It would seem that it is the duty of a court to deny an application to confirm the
report of commissioners deciding upon the construction of an elevated rail-
road, if the statute incorporating the corporation by which such undertaking
is to be carried out affords no adequate assurance of sufficient capital to ena-
ble it to build the elevated railway, or to respond to the adjoining owners for
the damages which would necessarily result from such building.

Where the directors of a corporation under its act of incorporation (Chapter 101
of 1892) are authorized to issue the stock thereof at such time and in such
manner and upon such terms as they shall deem proper, the only limitation
being that at least ten per cent of the par value of the stock at the time of the
first subscription thereto should be paid into the treasury of the corporation in
cash, it would seem that such directors might issue stock of the corporation at
less than the par value thereof.

APPLICATION by the petitioner, The East River Bridge Company,
for an order confirming the report of three commissioners appointed
by an order of the Supreme Court, made at the New York Special
Term on the 12th day of May, 1893, to determine whether a certain
railway ought to be constructed and operated by the petitioner,
under the provisions of chapter 4 of the Laws of 1891, as amended
by chapter 102 of the Laws of 1892.

*E. Lauterbach* and *G. W. Wingate*, for the motion.

*F. Morris*, *G. G. De Witt* and *C. Ferris*, opposed.

VAN BRUNT, P. J. :

By chapter 101 of the Laws of 1892 the East River Bridge Company was incorporated certainly with somewhat · extraordinary powers. By this act it was organized with a capital of $25,000,000, which it was authorized to increase or decrease at pleasure. It was also authorized to construct two bridges across the East river, one between a point at or near Broadway, in the city of Brooklyn, across the East river, to a point or place between Delancy and Rivington streets and Columbia and Cannon streets, in the city of New York, and the other commencing at a point between the pier line of East river and Fulton street, in the city of Brooklyn, across the East river to a point or place between Jackson and Scammel streets, in the city of New York. It was further provided that an approach to said first-mentioned bridge should be constructed and maintained from a point on said bridge at or about Cannon street, thence extending westerly over, through and along private property and across the intervening streets to the Bowery, and thence across the Bowery to Spring street, which extension might be extended if, in the judg- ment of a majority of the stockholders, it should be deemed for public convenience so to do, from its termination at the Bowery and Spring street westerly above, through and along Spring street to or near the Hudson river, in the city of New York. The company was also authorized to construct all necessary approaches other than those specified, and all necessary connections between said approach or approaches and bridges and any railroad or railroads in the city of New York, so as to enable passengers to be transported to and from the same.

By chapter 102 of the Laws of 1892, amending the Rapid Tran- sit Act, the directors of any company incorporated to construct, maintain and operate a bridge or bridges connecting a city of more than 1,000,000 of inhabitants with another situate in the State, and by the act of incorporation by which authority should have been conferred or intended to be conferred to construct, maintain and operate, as a part of or in connection with this bridge, an approach or approaches thereto, extending generally in an easterly or westerly direction, may determine, in lieu of constructing such approach or approaches, to build, maintain and operate an elevated railway, the route of which shall be coincident with the route of said approach

or approaches as defined by said act.  The method of procedure of such bridge company in that behalf were by the amendatory act prescribed and regulated.  The directors of the petitioner located the main cross-town approach above mentioned through a new street fifty feet wide, through private property to the Bowery, and from thence absorbing Spring street, through the same to West street, and thence turning to the south it continued along West street 1,200 feet to the Desbrosses Street ferry, connecting with the ferries of the Pennsylvania railroad.  An approach was also located to connect one bridge with the other, and to extend from such junction through Grand street to the East river.  The directors of the bridge company determined to construct, in lieu of these approaches, an elevated railroad, and adopted a plan of which a copy is annexed to the petition.  The consent of the local authorities to the construction was given, and the capital of the corporation reduced to $2,000,000, ten per cent of which has been paid in.  The property holders along the proposed line of said elevated railroads having refused their consent to their construction, application was made to the General Term for the appointment of commissioners under the Rapid Transit Act, which commissioners were appointed, who reported in favor of the enterprise, and the question now presented is whether the court should confirm the same.

The learned counsel for the petitioner seems to have a rather exalted idea of functions and the dignity of the determination of the commissioners appointed in this proceeding.  It is urged that the determination of the commissioners that the construction of the proposed road is a public necessity will not be reviewed by this court except fraud or manifest error on their part be averred, which is not the case, and that the conclusions arrived at by them upon all matters of fact are the same as the verdict of a jury as far as this court is concerned.  And our attention is called to the case of *In re Nassau Cable Co.* (36 Hun, 272) where the commissioners having reported adversely to the building of the proposed road, it was held that, in the absence of fraud or mistake in the proceedings, the General Term had no power to send the case back or to appoint a new commission, but that the determination of the commissioners was final.  This conclusion was evidently in accordance with the

law.    There is no provision in the Rapid Transit Act for any action upon the part of the court unless the report of the commissioners is in favor of the construction of such railroad.    Hence, by the very terms of the act, if the commissioners report against the enterprise it is final.    And for that reason the commissioners, in proceedings of this nature, have always resolved questions in regard to which there may be any possible doubt in favor of the applicant, in order that it may be finally determined by the court as to whether their conclusion should be confirmed or not.    Our attention is also called to the case of *In re N. Y. Elevated Railroad Co.* (70 N. Y. 357) where the Court of Appeals say that they cannot or, at least ought not, to interfere with the findings of the commissioners upon questions of fact.    Upon an examination of the act it is difficult to see where the Court of Appeals have any authority or jurisdiction to interfere with the question as to whether the benefits arising from the construction of an elevated railroad are of such a character as to counterbalance any damage which will be done to private interests from its operation.

This court is of opinion that the responsibility in respect to this matter of construction finally rests with it, and *it* is to determine, where the property holders have refused their assents upon all the facts before the commissioners, and those of which they may take judicial notice, whether it should authorize the construction of the railroad notwithstanding the objection of the persons who would be injuriously affected thereby.

It is not at all necessary to discuss any of the constitutional questions which have been raised upon this application, because, as we understand it, the court of last resort has practically swept away all the limitations which have been attempted to be placed upon private and local enterprises affecting private interests.    In *The Matter of Church* (92 N. Y. 1) it has been held that a law relating to particular persons or things as a class was general, while one relating to particular persons or things of a class was deemed local or private; and that an act which under no possible circumstances could apply to but a single county of the State, because it created a class consisting of one, and did not refer by name to the individual composing this class of one, was not local, but general, and, therefore, constitutional.    Under this decision all that it is necessary to do to

evade the constitutional provision is to use general language, quali-
fied, however, by particular descriptions which can make it applica-
ble only to the particular thing in respect to which there is an intent
to legislate.

An objection has also been raised that the petitioner has not suffi-
cient means or capital to complete the enterprise, or to compensate
the property owners for the damage which will result in case the
proposed railroad should be built, which, from the nature of the
charter of the applicants in this proceeding is a very serious objec-
tion.   It is true that the capital of this corporation is now
$2,000,000, which itself seems to be rather a small amount for the
undertaking of an enterprise which, it is conceded, will cost from
$30,000,000 to $35,000,000.   But there is no certainty that capital
to this amount will ever be paid in, because, under the act of incor-
poration of this corporation, the amount of the capital stock may
be diminished by the board of directors with the consent, in writ-
ing, of the stockholders holding a majority of the stock then issued
and outstanding at any time.   Hence, the security of these $2,000,000
of capital does not seem at all certain.   And further, under section
9 of the act, it would seem that the directors might issue these
$2,000,000 of stock upon the receipt of less than the par value
thereof, because it is provided that the directors may issue stock at
such time, and in such manner, and upon such terms as they shall
deem proper, the only limitation being that at least ten per cent of
the par value of the stock at the time of the first subscription
thereto shall be paid into the treasury of the corporation in cash.

If the views expressed are well founded, it would seem to follow
that it is the duty of the court to deny the present application, on
the ground that the statute affords no adequate assurance of suffi-
cient capital to enable the applicant to built the elevated railway
and bridge or to respond to the adjoining owners for the damages
which would necessarily result from such building.

But even this peculiar character of the organization which is
seeking to exercise these extraordinary privileges does not seem to
be the strongest objection against the granting of the privileges
asked for.

It is proposed, under the guise of an approach to a bridge crossing
the East river, to build an elevated railroad completely across the

city, entirely absorbing one of its streets from the Bowery to West street, and then going down West street to Desbrosses street, and there spread out and use West street for the purposes of a terminal station in connection with the ferry of the Pennsylvania railroad.

It has been urged by the opponents of this application that it is impolitic for the city of New York to afford facilities to get beyond the boundaries of the city.

We do not think, however, that this position is well taken, because, by providing means whereby clerks and other persons employed in the city of New York may reach, within reasonable time, places where they can procure homes more cheaply than could be done within the city limits, provision is thereby made for the more economical transaction of business in the city of New York. And by thus affording an opportunity to persons so employed within the city of New York to procure cheap and comfortable homes within a reasonable distance, the business interests of the city are advanced, and the morale of those employed improved. It seems to us, therefore, that there is nothing in this objection.

There is another point which ought to cause the court to hesitate before granting the power sought by these applicants, and that is that there does not seem to have been any substantial progress made towards the construction of the bridge to which this elevated railroad is claimed to be an approach. And as this railroad may be finished within a short period of time, compared to that which would be required for the construction of the bridge, and as the court, its consent once given, cannot impose conditions, the whole enterprise might stop with the building of this elevated cross-town railroad, to the great detriment of the city of New York at large, and with none of the advantages which are claimed to justify the court in granting such consent.

And it seems to us that a cross-town road, connecting merely the ferries from New Jersey with those of Brooklyn, would not be of sufficient value to this municipality to justify the blockading of its streets, the interfering with its present and future means of transportation, and the injury which would necessarily result to the owners of adjoining property.

There is a further objection to the granting of the application at this time, which we deem important. It is a matter of common

knowledge that a commission acting in pursuance of authority are, and for sometime have been, engaged in an effort to solve the problem of rapid transit.

The question submitted to them, in the hope that a successful scheme of rapid transit would result, is one of the greatest importance to this municipality. The benefits, if any, which would result to it from the building of a cross-town road such as is now proposed, would be incomparably less than the other, and for that reason the right of the applicant to take the public streets should not be granted, at least until the present attempt to obtain a rapid transit system lengthwise of the island, other than underground, shall be substantially abandoned, because the building of this road, or even the granting of the right to occupy the streets, might prove of serious embarrassment to the plans which may ultimately be formed.

In short, the objections to the court at the present time giving its consent to the acquisition by the applicants of the privileges sought are so numerous, and seem to us so obvious and so grave that it is our plain duty to refuse to confirm the report of the commissioners.

PARKER, J., concurred.

FOLLETT, J. (dissenting):

I am unable to concur in the result reached by the majority of the court. One of the principal grounds upon which the report of the commissioners is rejected is that the corporation "has not sufficient means or capital to complete the enterprise." The 2d section of chapter 101 of the Laws of 1892 (the statute under which the corporation is organized) fixed its capital stock at $25,000,000, divided into shares of $100 each, and it provides that the capital may at any time be increased or diminished by the board of directors with the consent, in writing, of stockholders holding a majority of the shares then outstanding. Before these proceedings were begun the capital stock was reduced to $2,000,000, all of which has been subscribed for at par, and ten per cent thereof paid in cash to the treasurer of the corporation. The estimated cost of the bridges and roads proposed to be constructed is from $25,000,000 to $30,000,000.

It has not been the policy of this State to require corporations engaged in the construction of internal improvements to procure

sufficient capital to be subscribed to complete the work, and as a condition precedent to the right to commence the work or to acquire, by the exercise of the right of eminent domain, lands necessary for the enterprise. Corporations for the construction of steam roads may be originated on a capital stock equal to $10,000 per mile for each mile proposed to be constructed, of which ten per cent in cash must be paid in. (Chap. 565, Laws 1890, § 2.) Under this act when $1,000 per mile has been paid in, representing a subscription of $10,000 per mile, construction may be begun, and the right of eminent domain exercised. Ten thousand dollars per mile is a very small part of the sum necessary to be expended to construct and equip a modern railway. I doubt if the history of internal improvements in this country shows a single instance in which all or a considerable part of the capital required to construct a railroad of any great length, or important canal, or a bridge for railways over any of our great rivers has been subscribed before the corporation entered upon the work of construction. When the work of construction has progressed and the enterprise is shown to be feasible capital is attracted and invested in the form of stock or bonds. It seems unreasonable to require that sufficient capital should be subscribed to complete an undertaking requiring the expenditure of $25,000,000 or more before the right to undertake its construction has been acquired. Sufficient should be subscribed to show that the application is made in good faith and that there is reasonable probability that capital will be secured to complete the undertaking. It is said that sufficient capital has not been subscribed to pay the damages which will be occasioned to the owners of lands upon the route. A sufficient answer to this is found in the Constitution, which provides: "Nor shall private property be taken for public use without just compensation." The corporation could not take any private property without first making just compensation to its owner.

I concur in the proposition "That a cross-town (elevated) road, connecting merely the ferries from New Jersey with those from Brooklyn, would not be of sufficient value to this municipality to justify the blockading of its streets, the interfering with its present and future means of transportation, and the injury which would necessarily result to the owners of adjoining property." And it

seems to me apparent that the earnings of such a line would be so insignificant that its construction would not be entered upon by capitalists without it connected with a bridge or bridges crossing the East river, and that the danger that the road may, and the bridges may not, be constructed is quite remote.

I fail to find any evidence in the record showing that the construction of the lines proposed would interfere with the operation of any one of the elevated roads now constructed, or of such as may hereafter be constructed, if such rights and possibilities are to be taken into account.

This proceeding is taken under the following provision of section 4 of chapter 4.of the Laws of 1891, which is substantially a copy of section 18 of article 3 of the Constitution of this State : " Provided that the consent of the owners of one-half in value of the property bounded on and the consent also of the local authorities having control of that portion of a street or highway upon which it is proposed to construct or operate such railway or railways be first obtained, or in case the consent of such property owners cannot be obtained, that the determination of three commissioners appointed by the General Term of the Supreme Court in the district of the proposed construction, given after due hearing of all parties interested, and confirmed by the court, that such railway or railways ought to be constructed or operated, be taken in lieu of the consent of such property owners."

Is the right which is vested in the property owners to refuse assent to the .construction of a road simply for the protection of their own private interests, or is it for the purpose of protecting public interests as well ?

It will be observed that in case the consent of one-half of the property owners cannot be obtained, that the approval of three commissioners, confirmed by the General Term, may be taken in lieu of their consent. Whether property owners may raise, and this court consider, objections of purely a public nature, or such as may affect the rights of existing street or elevated railroad corporations, or of such corporations yet to be organized, which in no way affect the private rights of the contesting property owners, cannot be profitably considered in a dissenting opinion, and especially in view of the fact that the question has not been discussed.

I find no evidence which shows that the construction of this road will more seriously affect the rights of owners of property on its line than the construction of existing elevated railroads has affected such rights on many of the streets in this city, or that it will more seriously affect the rights of such owners than will the construction of elevated railroads in the future, if any are to be constructed. It seems to me that this judgment is a dangerous precedent and substantially denies the right to construct new elevated roads.

Upon the question whether the proposed bridge and railway will be a great public benefit, I rely upon : (1) The approval of the common council of this city ; (2) the approval of the War Department of the United States ; (3) the unanimous approval of a strong commission appointed by this court, which has not contented itself with giving a perfunctory report, but has supported its decision by cogent reasons. Gentlemen of distinction, who have given great attention to the question of rapid transit, testified before the commission, among them the mayor of the city of Brooklyn and ex-Mayor Hewitt of this city. Mr. Hewitt testified : " I think an elevated railway crossing the island in the general neighborhood specified there, and connected with the various existing lines of transportation, would be a very great advantage to the city of New York and to its inhabitants. * * * I think a connection between the ferries and the existing lines of transportation, the elevated lines, would be very advantageous to the city. Q. By such a railway as is proposed ? A. By such a railway as you have sketched on that map. Q. An elevated railway ? A. Yes ; I think it would be still more advantageous if it connected with all of the ferries below Desbrosses street ; I think the defect of it is that it does not go far enough."

Other witnesses testified to the same effect. And it seems to me that the evidence sustains and justifies the conclusion reached by the learned commissioners, and that their report should be confirmed.

Application to confirm the report of the commissioners denied.